SHEPARD'S POINT LAND CO. v. ATLANTIC HOTEL.

(Filed May 5, 1903.)

NAVIGABLE WATERS—*Grants*—*Riparian Owners*—*Easements*—*The Code, Sec. 2751*—*Acts 1889, Ch. 555*—*Acts 1891, Ch. 532*—*Acts 1893, Ch. 17*—*Acts 1858, Ch. 136*—*Waters and Watercourses.*

A grant to a riparian owner of land covered by navigable water conveys only an easement therein and a deed of the land adjoining the navigable water conveys the easement in the land covered by the water.

ACTION by Shepard's Point Land Company against the Atlantic Hotel, heard by Judge *George H. Brown,* at September Term, 1902, of the Superior Court of CARTERET County. From a judgment for the plaintiff the defendant appealed.

*W. W. Clark* and *Lindsay Patterson,* for the plaintiff.
*C. L. Abernethy, Simmons & Ward* and *Armistead Jones & Son,* for the defendant.

CONNOR, J. The plaintiff brings this action for recovery of possession of a tract of land described in the complaint as "lying and being situate in the County of Carteret, in Morehead City, adjoining the square on which the hotel building of the defendant is located, and known and described as

square No. 83 in the plan of Morehead City." It alleges that the defendant is in possession of the above described lot "upon which there has been erected certain walks, wharves, bath houses, pavilion, etc., and that such possession is unlawful and wrongful."

The defendant denies that the plaintiff is the owner of the property described in the complaint and denies that it is in possession thereof, except that it has a wharf, walkway and two bath houses leading from the rear of said hotel over and into the waters of Bogue Sound. It avers "that Bogue Sound is an arm of the sea, navigable for sea vessels and other ships, and the said hotel is about a mile from the Atlantic ocean; the tide from said ocean ebbs and flows daily in said sound and upon the shore whereon the said hotel is located, and the space between the said hotel and bath houses and where the walkway and wharf are situated is covered by the waters of said sound and the defendant is advised that the plaintiff has no title thereto."

The plaintiff claims the land, which is covered by water, described in the complaint and known in the plan and on the map of Morehead City as Square No. 83, under the following chain of title, to-wit: Grant from the State to John M. Morehead and W. L. Arendell, bearing date May 2d, 1856. The grant is made to said grantees, "owners and riparian proprietors of the lands known as the Shepard's Point Lands on Beaufort Harbor." It includes the tract or parcel of land lying around Shepard's Point Lands and between high water mark and the deep water of Bogue Sound, Newport River and Calico Creek." The description in the grant covers 502 acres of land and surrounds the lands known as the Shepard's Point Lands, which by the charter of Morehead City embraces the entire water front of the said city and runs out from high water mark on the shores of said lands to the deep water of said sound, river and creek. The

LAND CO. *v.* HOTEL.

Shepard's Point Land Company was chartered by Chapter 136, Laws 1856. The charter was extended by Chapter 50, Acts 1887. The town of Morehead City was incorporated by Chapter 172, Laws 1860-'61. Section 6 provided "That the corporate limits of said city shall embrace the entire plan of the city of Morehead as published by the Shepard's Point Land Company, and from the terminus of the Atlantic & North Carolina Railroad Company to Fifteenth street."

The plaintiff introduced deeds tending to show that at the time of issuing the grant, May 24, 1856, the grantees were the owners of Square No. 1 and that said square was abutting Square No. 83, the latter being the water front covered by water and extending out into Bogue Sound. The plaintiff offered deeds tending to show that the defendant company had acquired title by direct chain from John M. Morehead and W. H. Arendell through the plaintiff, who owned Squares No. 1 and 83 at the time of the conveyance of Square No. 1, upon which the "Atlantic Hotel" is located. The plaintiff introduced a deed from the Shepard's Point Land Company to John M. Morehead, dated August 19, 1859, conveying Square No. 1, "bounded on the north by Arendell street, on the east by Third street, on the south by Evans street and on the west by Fourth street." The plaintiff introduced chain of title to Square No. 1 from John M. Morehead to the defendant, and also introduced a map of Morehead City. It will appear by reference to that map that Evans street for a considerable distance, and especially between Squares No. 1 and No. 83, "is covered by the tide water at high tide and has never been opened between Squares No. 1 and 83, and is not used as a public street."

W. L. Arendell, a witness for the plaintiff, testified: "The hotel is on Square No. 1 and is known as the Atlantic Hotel. The water front is Square No. 83 and is covered by water. At low tide a small portion of it is not covered by water.

The wharves and bath houses on Square 83 were built in the latter part of 1880 by the Morehead City Hotel Company, under whom the defendant claims. There are two wharves or piers. They are about eight feet wide, and one is about 200 feet long and is connected with the hotel and extends out into Bogue Sound; about fifty feet from the end of it is the gentlemen's bath house. The other pier extends out into the sound about eighty feet, and is connected with the other wing of the hotel, and at the end of it is the ladies' bath house. These wharves and bath houses are in the waters of Bogue Sound and on Square 83. The depth of water at the end of the long pier is from six to eight feet, sometimes more, sometimes less, according to the tide. The depth of the water at the end of the ladies' pier is about five feet, varying acording to the tide. The tidewater at high tide washes up to Square No. 1 and within a few inches of the brick foundation of two of the wings of the hotel. Square No. 83 is south of Square No. 1 and is generally covered by water. There was a street leading off, upon the plan of said town, between Square 83 and Square 1. This street is called 'Evans street' and is sixty feet wide, but it has not been opened between Squares 1 and 83 and is not used as a public street of Morehead City. At high tide it would be very nearly covered by water. The grant to John M. Morehead and W. H. Arendell covers Square 83. Evans street was laid off on the plan of the town after the issuing of said grant. Square 83 is always covered by the tide at any ordinary high tide and the greater part of it is covered at low tide. The ocean tide comes in at the inlet, which is about two miles off, and ebbs and flows over Square 83; this square is a part of Bogue Sound. Boats sail from the ocean and on the ocean and back to the hotel, and sail over and about Square 83, and tie up and anchor all along the long pier from its end up to 75 or 100 feet towards the hotel, according to the state of the tide.

Square 83 covers the deepest part of that part of Bogue Sound, and that part is connected with the balance of the sound by navigable waters for small vessels, both to the eastward and to the westward. The Shepard's Point Land Company and Morehead never did build any wharves or piers on Square 83."

His Honor submitted to the jury the following issues:

1.   Is the plaintiff the owner and entitled to the possession of the land described in the complaint as Square 83?

2.   Is the defendant in possession of any part thereof?

The court instructed the jury that if they believed the evidence they should answer the first issue "Yes" and the second issue "Yes," and the defendant excepted. It is agreed that the court answer the issues accordingly. Judgment was rendered thereupon and the defendant appealed.

The plaintiff's title and right to recover are dependent upon the construction of Section 2751 of The Code, being Chapter 21, Acts 1854-'55, in the following language: "All vacant and unappropriated land belonging to the State shall be subject to entry except lands covered by navigable streams, provided that persons owning lands on any navigable sound, river, creek or arm of the sea, for the purpose of erecting wharves on the side of the deep waters thereof next to their lands, may make entries of the lands covered by water adjacent to their own as far as deep water of such sound, river, creek or arm of the sea, and obtain title as in other cases. But persons making such entries shall be confined to straight lines, including only the fronts of their own tracts, and shall in no respect obstruct or impair navigation. And when any such entry shall be made in front of the lands of any incorporated town, the town corporation shall regulate the line of deep water to which entry shall be made."

The question presented for decision is of great importance and by no means free from difficulty. It will be well, before

entering into an examination of the principles and authorities by which we shall be guided in reaching a conclusion, to note the history of the legislation in North Carolina in regard to the control and disposition of our navigable waters. It was held in *Tatum v. Sawyer,* 9 N. C., 226, that lands covered by navigable waters were not subject to entry under the entry law of 1777, "not by any express prohibition in that Act, but being necessary for public purposes as common highways for the convenience of all, they are fairly presumed not to have been within the intention of the Legislature."

Ruffin, J., in *Ward v. Willis,* 51 N. C., 183; 72 Am. Dec., 570, said: "It happened, however, that in the revisal of 1836 those parts of the previous Act were omitted, and therefore the court felt bound to hold in *Hatfield v. Grimstead,* 29 N. C., 139, that entries of land in Currituck Sound were good after it ceased to have a tide or be navigable by reason of the closing of the inlet, or rather of such parts of the sound as frequently were not covered by water. When the omissions of the revisal were discovered in 1846, the Legislature by an Act of that year, Chapter 36, revived the provision omitted by enacting that entries of land lying on any navigable water should be surveyed in such manner that the water should form one side of the survey and the land laid off back from the water, and proceeded further to enact that it should not be lawful to enter land covered by any navigable sound, river or creek." The court in that case held "that land lying between the high and low water lines of the tide of the ocean or a navigable stream is not subject to private appropriation under the Acts authorizing the entry and grant of lands by the State."

This continued to be the law until 1854, when the Act, Section 2751 of The Code, was enacted. In 1889, Chapter 555, this Act was amended by adding after the word "navigation" the following: "Provided further that no land cov-

ered by water shall be subject to entry within thirty feet of any wharf, pier or stand used as a wharf already in existence, or which may hereafter be erected by any person on his own land or land under his control or on an extended line thereof; but land covered by water as aforesaid for the space of thirty feet from the landing place or line of any wharf, pier or stand used as a wharf as aforesaid, shall remain open for the free ingress and egress of said owner and other persons to and from said wharf, pier or stand." By the laws of 1891, Chapter 532, the section is so amended as to read: "Lands covered by navigable waters, provided that persons owning lands on any navigable water for the purpose of erecting wharves or fish houses or for fishing in said waters in front of their lands, may make entries of the land covered by said water and obtain title as in other cases, but persons making such entries shall be confined to straight lines, including only the fronts of their own lands, and shall in no case extend a greater distance from the shore than one-fifth of the width of the stream, and shall in no respect obstruct or impair navigation provided nothing in this Act shall apply to Currituck County."

By the Act of 1893, Chapter 17, Section 2751, of The Code, is amended by striking out the words "to which entries may be made," and inserting instead thereof the words *"to which wharves may be built."*

It is noted in the plaintiff's brief, and known in connection with the history of the State, that at or about the time that the Act of 1854 was passed, the Atlantic & North Carolina Railroad, having its terminus at what was to be Morehead City, although projected, had not been completed to that point.

The plaintiff's title is dependent upon maintaining three propositions: 1. That the title to navigable waters, sounds, arms of the sea, etc., is vested in the State and may be granted

by the State to private individuals.   2.   That by the grant
issued to Morehead and Arendell, pursuant to the Act of
1854, they became the absolute owners of the soil covered
by the navigable waters of Bogue Sound, Newport River
and Calico Creek, described in the said grant and containing
502 acres; and (3) That such title as they acquired passed to
and vested in the plaintiff corporation separate and distinct
from its ownership of the soil theretofore granted by the State,
upon which is located the town of Morehead City, including
the defendant's lot No. 1, upon which is built the Atlantic
Hotel and that its ownership is in no respect dependent upon
the use to which the land in controversy is to be put, or its
riparian ownership of the shore.

It is abundantly settled by the courts of this State and
the United States that after the Revolutionary War the States
became the owners of and retained the title to the lands cov-
ered by navigable waters, and that they have the power to
grant those lands to private individuals.   This has been the
well settled doctrine in this country since the case of *Martin
v. Waddell*, 41 U. S., 367.   "The principle has long been
settled in this court that each State owns the beds of all tide
waters within its jurisdiction unless they have been granted
away.   In like manner, the States own the tide waters them-
selves and the fish in them so far as they are capable of
ownership while running."   *McCready v. Virginia*, 94 U.
S., 391.

Ruffin, J., in *Ward v. Willis,* 51 N. C., 183, says: "It
seems thus to be clear that whatever soil is at any time covered
by any navigable water in its natural state is deemed to be in
the same State as if it were in the bed of the water; in other
words, that it is all one, whether it be under the channel or
the margin between the high and low water lines.   The same
public purposes require that here, as in England, the State
should reserve lands in that situation from private appro-

priation, and although it may please the Legislature to dispose of that by special grant *for the promotion of trade and the growth of a commercial town accessible to vessels, it rationally accounts* for the restriction upon the common mode of granting other public lands, and enables us to *discover* the extent of the restriction imposed, and understand the terms in which it is imposed."

Mr. Justice Field, in *Illinois Central Railroad v. Illinois,* 146 U. S., 387, thus defines the status of lands covered by tide waters: "It is a settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof when that could be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States. This doctrine has been often announced by this court, and is not questioned by counsel of any of the parties"—citing *Pollard's Lessee v. Hagan,* 3 How., 212; *Weber v. Harbor Commrs.,* 18 Wall., 57.

For the purpose of this discussion, we treat the first proposition as settled. There has been, however, some discussion and conflict of opinion in respect to the extent of the right of the State to grant the soil under its navigable waters, held in trust for the use of all of the citizens, to private persons.

Mr. Justice Field in a very able opinion in the *Illinois Central Railroad* case, *supra,* in discussing the character of the title which the State holds in her navigable waters, uses the following language: "The question, therefore, to be considered is whether the Legislature was competent to thus

deprive the State of its ownership of the submerged lands in the harbor of Chicago, and of the consequent control of its waters; or, in other words, whether the railroad corporation can hold the lands and control the waters by the grant, against any future exercise of power over them by the State. That the State holds the title to the lands under Lake Michigan, within its limits, in the same manner that the State holds its title to soil under tide water by the common law, we have already shown, and that title necessarily carries with it, control over the waters above them whenever the lands are subjected to use. *But it is a title different in character from that which the State holds in lands intended for sale.* It is different from the title which the United States holds in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them and have liberty of fishing therein, freed from the obstruction or interference of private parties. *The interest of the people in the navigation of the waters and in commerce over them may be improved in various instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged land, and so long as their disposition is made for such purpose, no valid objection can be made to the grants.* It is grants of parcels of land under navigable waters that may afford foundation for wharves, piers, docks and other structures in the aid of commerce, and grants of parcels, which, being occupied do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public, upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State

over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, can not be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. General language sometimes found in the opinions of the courts, expressive of absolute ownership and control by the State of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular case. *A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation.* The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of navigation and the use of the waters, or when parcels can be disposed of without impairment of the public interest

in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. So with trusts connected with public property or property of a special character, like lands under navigable waters, they can not be placed entirely beyond the direction and control of the State. . . . . We can not, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of a private corporation. But the decisions are numerous which declare that such property is held by the State, by virtue of its sovereignty, in trust for the public. The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental and can not be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."

The plaintiff contends that this court has construed Section 2751, and that the grantees, Morehead and Arendell, by the grant issued to them pursuant thereto, acquired the absolute ownership of the soil under the water subject only to the right of navigation by the citizens of the State. If this contention be well founded, it must be conceded that the plaintiff may bring a possessory action and remove the defendant from any occupancy thereof. If the question has been decided by this court, we would feel compelled to follow such decision, as a rule of property, without regard to our own views. The first case in which the question came before the court is *Gregory v. Forbes,* 96 N. C., 77. An examination of the original record on file in this court shows that the plaintiff, a riparian owner, desiring to erect a wharf

in the waters of North River, obtained a grant from the State for the lands adjacent thereto "for the purpose of erecting a wharf connecting with the shore, under the provisions of Section 2751 of The Code." The plaintiff averred that the defendant, who was not a riparian owner, had erected and is using a wharf on the lands embraced in the grant, and that the plaintiff was thereby prevented from erecting his wharf. The defendant set up a lease from the County Commissioners, etc. The plaintiff after showing title to the shore line introduced a grant from the State to "the water-covered-land in front of the shore". . . . The survey after giving boundaries of 24 acres annexes the qualifying words *"for wharf purposes"*. Smith, C. J., says: "As the owner of the shore, the plaintiff had a right under the law to enter the water front up to deep water so as not to obstruct navigation, and thus acquire property in the soil. The survey, and we assume the entry which it must follow, *expressly declares that it is for wharf purposes and this is the only use for which the grant could issue*. . . . And for our present purpose the grant is operative. Inasmuch as the State can only issue a grant for land covered with navigable water *for the purpose of erecting a wharf, and this only to the riparian owner,* we are unable see how the right claimed by the defendant could be conferred by the County Commissioners to a stranger, like the defendant." The court below having held upon the plaintiff's showing that he was not entitled to recover, the court simply decided that "the case was a proper one for them to pass upon." In our opinion this case falls very far short of sustaining the position of the plaintiff in this action. We note the careful restriction which the Chief Justice places upon the words of the grant. It is sufficient to note now that it is only for our "present purpose that the grant is operative." As shown by Mr.

Monroe's very accurate and valuable "Marginal Annotations" the case is not cited in our Reports.

The next case in which the court expresses an opinion in regard to the construction of Section 2751 is *Bond v. Wool,* 107 N. C., 139. This was a controversy between two riparian owners, neither having any grant under the section of The Code referred to, but relying entirely upon their rights as riparian owners. The plaintiff sought to enjoin the defendant with interfering with his fish house by a threatened erection of a wharf in front of the defendant's land. The construction of Section 2751 was not in any way involved in the discussion or the decision of the case. The court held that "leaving our Legislature out of view, the plaintiff, or H. A. Bond, Sr., under whom he claims, is at least in the discussion of this appeal to be considered as holding, as an incident to the ownership of lot No. 187, the right to build fish houses over the water at any point east of the dotted line . . . . and in front of the said lot between the land and the navigable water, etc. But the defendant Wool has, if his interest is not affected by our statute, the very same right," etc. It is true that the court proceeds to cite the statute and comment upon it, noting that the riparian owner was restricted by the Act of 1777, Chapter 114, Section 15, to the water mark, etc., saying "The Act of 1854-'55 (The Code, Sec. 2751) made an exception in favor of riparian owners on any navigable sound, river, creek or arm of the sea, by giving to them the exclusive privilege of acquiring the absolute fee in the precise territory on their fronts, in which they already held, as incidents to the original grant, the qualified property or appurtenant right which we have defined."

In *Holly v. Smith,* 130 N. C., 85, CLARK, J., says: "The land here in question, as was admitted on the trial, is covered by the navigable waters of Chowan River, and therefore it

was not subject to entry, *except for wharves by the adjacent riparian owner in front of his own property,* and even then subject to restrictions." No other cases in our Reports construe this section of The Code.

In *State v. Glenn,* 52 N. C., 321, Battle, J., says: "We hold that any waters, whether sounds, bays, rivers or creeks, which are wide enough and deep enough for navigation of sea vessels are navigable waters, the soil under which is not subject of entry and grant under our entry law." This case was decided in 1859. No reference is made to the Act of 1854-'55, Chapter 21.

The authorities bearing upon this subject in other States are conflicting and it is difficult to thread our way through the divergent decisions. To some extent this conflict may be explained by noting the distinction between the title to flats and marshes over which the tide ebbs and flows, but which are not in any correct sense of the term navigable waters, and those cases in which the land sought to be recovered is covered by navigable water. The learned counsel for the plaintiff frankly concedes that the question presented is, "Who owns the soil covered by Bogue Sound, Newport River and Calico Creek?" Newport River is navigable some distance above Morehead City. *Doughty v. Railroad,* 78 N. C., 22.

In *Chishom v. Cairns,* 67 Fed. Rep., 285, Simonton, Circuit Judge, says: "It would seem that there is a great distinction between the shores of the great ocean, the beds of harbors, the channels of rivers and highways of commerce, and these mud shores cast up by the currents on the sides of the harbors and streams. The former must always be kept open for *public use, commerce, trade and pleasure.* The latter can be separated from any public use and can be vested in individuals."

A correct decision of this case involves an inquiry as to

the extent to which the State has parted with the title to the land described in the grant under which the plaintiff claims, and what effect shall be given to the words "for the purpose of erecting wharves in the side of the deep waters next to their lands." The grant must be read and construed as if these words were written into it. The plaintiff insists that the absolute ownership of the soil passed under the grant; that by it the grantees, although described as "riparian owners and proprietors," became the owners of Square 83 independent of their ownership of the shore that whatever rights they had incident to their riparian ownership were destroyed, or at least merged into their separate and independent ownership under the grant; that when the land company conveyed to John M. Morehead Square No. 1 by deed bearing date August 19, 1859, he took title to the lot stripped of any riparian rights in respect to the navigable waters upon which it abutted; that the defendant took its title from persons claiming through Morehead in the same plight and condition. In this connection the plaintiff calls attention to the fact that Evans street, sixty feet wide, separates Square 1 from Square 83, and that therefore the defendant does not abut upon Square 83. The evidence in regard to the street is that of W. L. Arendell, who says "this street is called Evans street and is sixty feet wide, but it has not been opened between Squares 1 and 83, and is not used as a public street of Morehead City; at high tide it would very nearly be covered by water. Evans street was laid off on the plan of said town after issuing of the grant." In the absence of any evidence that there was a dedication to or acceptance or use of the street by the town, in the view which we take of the title which Morehead and Arendell acquired by the grant, we do not think the so-called street can be considered as affecting the rights of either party to this controversy. The plat seems to have been made prior to 1860, and during all

these years no one has ever claimed, used or treated these sixty feet as a street. It is incapable of being so used. We therefore dismiss this phase of the case from further consideration.

The defendant contends that the grant conferred upon the grantees only an easement, giving the right to build wharves out to deep water. Certainly some force and effect must be given to the limitation put upon the use to which the thing granted may be put. The policy of the State from 1777 until 1854 was, as we have seen, to preserve its title to the navigable waters, as the same had been held by the King of England, in trust for the free use of all of its citizens. As said by Ruffin, J., in *Ward v. Willis,* 51 N. C., 183: "When it was found that in the revisal of the statutes the prohibition against entry and appropriation had been omitted, as pointed out in *Hatfield v. Grimstead,* 29 N. C., 139, the Legislature immediately re-enacted the omitted sections. Prior to 1854, the owners of lands abutting upon navigable waters had as incident thereto certain riparian rights, the extent and stability of which were not very well settled either in this or other States of the Union. The State had on December 27, 1852, chartered the Atlantic & North Carolina Railroad Company, which was to have its eastern terminus at a point afterwards known as Morehead City. The State aided liberally in building this road, as did the counties through which it runs. This road was to be the completion of a system of railroads connecting the western portion of the State with the ocean, and thereby making a North Carolina system of travel and transportation. It was the conception of a wise and patriotic statesmanship. Bynum, J., in his very able dissenting opinion in *State v. Railroad,* 72 N. C., 645, says: "No railroad scheme was ever devised by more of the wisdom and patriotism of the State. It was intended to be in fact what it was in name, the *North Caro-*

*lina Railroad,* which, when completed from the Atlantic to the Tennessee line, would radiate a uniform system of lateral roads connecting all parts of the State in a common brotherhood by an easy and convenient intercommunication of trade and travel." Beaufort Harbor was to be the haven for vessels and steamships which were to bring to and carry from the State its imports and exports. It was expected that a great seaport city was to grow up. It is interesting to note that by Chapter 136, Acts 1858, the plaintiff corporation was chartered, one of the powers conferred being to "erect wharves;" and that on February 16, 1855, Chapter 22, Laws 1855, the Act was passed on which the plaintiff bases its claim. In 1860, Morehead City was chartered, the boundaries of which as we have seen corresponding with those of the Shepard's Point Land Company. Considered in the light of the then existing conditions, it is difficult to believe that the policy of the State for nearly a century was to be reversed and the growth of the prospective seaport was to be hampered by the grant of the absolute ownership of the entire water front thereof, separate and distinct from the ownership of the abutting lands; that the State was to part with this property which it held in trust for all of its citizens. Nothing, save a clear declaration of such purpose, would justify this conclusion. At that time the rights of riparian owners, while defined, were not settled in respect to their freedom from State interference. Lewis on Eminent Domain says: "The older and perhaps more numerous authorities hold that such an owner has no private rights in the stream or body of water which is appurtenant to his land, and in short, no rights beyond that of any other member of the public, and that the only difference is that he is more conveniently situated to enjoy the privileges which all the public have in common, and that he has access to the water over his land and the public has not. . . . . Access

to the use of the stream by the riparian owner is regarded as merely permissive on the part of the public and liable to be cut off absolutely if the public see fit to do so." Vol. 1, Sec. 77.

The courts had very generally held both in this country and England that such was the extent of his rights. Wood on Nuisances thus stated the law: "He does not, from the mere fact that he is the owner of the bank, acquire any special or particular interest in the stream over any other member of the public, except by his proximity thereto he enjoys greater convenience than the public generally. . . . . But this is a mere convenience arising from his ownership of the lands adjacent to the high water mark, and does not prevent the State from depriving him entirely of this convenience by itself making erections upon the shore or authorizing the use of the shore by others in such a way as to deprive him of this convenience altogether, and the injury resulting to him therefrom, although greater than that sustained by the rest of the public, is *damnum absque injuria.*" 1 Wood on Nuisances (1st Ed.), 592. This doctrine had been held by the New York courts in 1852 in *Gould v. Hudson River R. Co.,* 6 N. Y., 522. The Supreme Court of the United States has so held in *Hoboken* against *Pa. Railroad Co.,* 124 U. S., 690. This court in *Collins v. Bembury,* 27 N. C., 118; 42 Am. Dec., 115, held that the riparian owner did not have the exclusive right of fishing "unless such right be derived from an express grant by the sovereign power."

We can readily understand that Governor Morehead, a man of great sagacity and wisdom, recognized the necessity of securing the permanency as well as the extent of the riparian rights which had been acquired by the grant of the Shepard's Point lands. It is evident that it was its purpose to sell the lots, which the map in evidence shows had been laid off, and encourage persons to buy and build upon them.

Certainly he did not intend to secure the absolute ownership of the entire water front of the prospective city and hold it separate and apart from the ownership of the land, which he, as president of the land company, was conveying to purchasers. He certainly did not contemplate controlling the gateway to the channel and cutting off the fishing and other privileges incident to the ownership of the abutting land, such as building wharves, etc. To have done so would have been destructive of its growth and prosperity, and would have reversed the policy of the State for so many years. If the construction contended for by the plaintiff is correct, no purchaser of a town lot fronting on the waters could have erected a wharf, pier or bath house, or enjoyed many other privileges incident to his riparian ownership without the consent of the owners of the navigable waters, and the Shepard's Point Land Company could now levy tribute upon the commerce, business and pleasure of the citizens of the town. The right of navigation would be of little value if a corporation, after selling the lots with water fronts, could prevent the building of wharves and enjoying other privileges. If this were the purpose and policy of the Legislature, why restrict the grant to the purpose of "erecting wharves on the side of deep water thereof next to their lands?" and why restrict the privilege to "persons owning land on any navigable waters?"

It has been held in recent years, both in this country and in England, that the riparian rights which vest in the grantee of lands are vested rights and can not be taken or separated from the ownership of the land except for public purposes, and then by paying compensation therefor.

The case of *Gould v. Railroad, supra,* was expressly overruled by *Rumsey v. N. Y. & N. E. Railroad,* 133 N. Y., 79; 15 L. R. A., 618; 28 Am. St. Rep., 600, in which it was held that the owner of land upon a public river is entitled to

such damages as he may have sustained against the railroad company which constructs its road across its water front, and deprives him of access to the navigable part of the stream, unless the owner has granted the right, or it has been obtained by the power of eminent domain.      The riparian rights, which the grantee acquires by virtue of the grant of the abutting soil, are stated by Mr. Justice Miller in *Yates v. Milwaukee,* 10 Wall. 497: "Whether the title in the owner of such lot extends beyond the dry land or not, he is certainly entitled to all the rights of the riparian proprietor whose land is bounded by a navigable stream, and amongst those rights are access to the navigable parts of the river from the front of his land, the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever those may be.  .  .  .  .   This riparian right is property and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it can not be arbitrarily or capriciously destroyed or impaired.  It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good upon due compensation."

In the case of the *Duke of Buccleuch v. Board of Works,* L. R. 5 E. & I. Appeals, 418, and 41 L. J. Ex., 137, Lord Cairns says: "It has appeared to me throughout that the property of the plaintiff in error in this case was what is commonly called riparian property.  The meaning of that is that it had a water frontage.  The meaning of its having a water frontage is this, that he had a right to the undisturbed flow of the river which passed along the whole frontage of the property in the form in which it had formerly been accustomed to pass.  That being the state of things, this water

frontage, with the right which the plaintiff in error possessed was taken for the purposes of the act. Beyond a doubt, this water right was a property belonging to the plaintiff for which compensation was to be made, and it was for the arbitrator to assess the compensation to which the plaintiff was entitled upon that footing."

In *Lyon v. Fishmonger's Co.,* L. R. 1 Appeal Cases, 670, it is held that a riparian property owner on the river Thames and the owner of lands near a public dock upon the river were entitled to compensation in respect to their lands being injuriously affected by being deprived of access to the river and dock.

Lewis on Eminent Domain, Section 83, says: "The following rights may be enumerated as appurtenant to property upon public waters:

"1.   The right to be and remain a riparian proprietor and to enjoy the natural advantage thereby conferred upon the land by its adjacency to the water.

"2.   The right of access to the water, including a right of way to and from the navigable parts.

"3.   The right to build a pier or wharf out to the navigable water, subject to any regulations by the State.

"4.   The right to accretions or alluvium.

"5.   To make a reasonable use of the water as it flows past or laves the shore."

He says it follows that any injury to riparian rights sufficient to be used is a taking for which compensation must be made.

Thus we see that when the soil was granted by the State that certain riparian rights passed as incidents thereto, and that these rights were vested, and the State could not itself nor permit others to interfere therewith except for public purposes and then only by making compensation. It would seem to follow from this conclusion that the original grantees

of the Shepard's Point lands acquired rights in the navigable waters which the subsequent grant could not affect injuriously, and that these rights passed as appurtenant to such lands to the purchasers thereof.

The Legislature of Florida in 1856 passed an Act reciting that "Whereas it is for the benefit of commerce that wharves be built and warehouses erected  .   .   .   . ; and whereas, the State being proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving their water lots," it is thereupon enacted that the State "for the consideration above mentioned divests herself of all right, title, etc., in lands covered by water in front of any tract of land  .   .   .   ." The Supreme Court of that State, in *Florida v. Phosphate Co.,* 32 Fla., 82; 21 L. R. A., 189, says: "In construing this Act, not only are we to keep in view the real nature of the subject-matter, but it is to be judged in the light of the rule applicable to all grants by the government, which is, that they are to be strictly construed or to be taken most beneficially in favor of the State and against the grantee. . . . . The plan of the act is that the title of the submerged land should be vested in the riparian owner for these uses and purposes." The State, "for the consideration above mentioned," divests herself and invests the riparian owner with the title to the land.

"These considerations" are for the purpose and end that commerce may be benefitted by the building of wharves, piers, etc. And the grant in this case is one of the class in which the subject of the grant, as long as it is of that character to be used or built for the benefit of commerce, is apparent and controlling. The court held that the right acquired was confined to the purposes set forth in the Act.

In *Gregory v. Forbes,* 96 N. C., 77, Smith, C. J., says: "The survey and we assume the entry which it must follow

declare that it is for wharf purposes, and this is the only use for which the grant could issue."

It is elementary learning that in construing a grant every part thereof must be given effect, unless absolutely inconsistent with other parts. Thus, in *Robinson v. Railroad,* 59 Vt., 426, land had been conveyed for the use of a plank road." The description of the land was complete without these words. The court said: "This clause can have no force as a description of the premises conveyed, and no force at all, unless as qualifying and limiting the grant. It is an important rule of construction applicable to all written instruments that every word and every clause shall so far as possible be given some force and meaning, and if construing the whole instrument one way, meaning is given to every word and clause, while construing it another way, some portion of the language used is rendered meaningless, the construction which gives force and meaning to all the language used, is, as a rule, to prevail. This is upon the presumption that the party making the instrument did not use any language except what was necessary to make it speak the intention of the parties thereto. Again, when it is doubtful what the construction should be, resort to the circumstances surrounding the transaction may be had to enable the reader to understand and apply the language used.  . . . . . We think this clause was intended as a limitation upon the grant, reducing from a grant of the fee to a grant of an easement for the use of a plank road, all that the grantee cared to acquire and all that the grantor would be likely to desire to part with."

In *Flaten v. City of Moorehead,* 51 Minn., 512; 19 L. R. A., 195, it was held that in a grant or deed conveying a tract of land immediately following the description of which were these words, "Said tract of land hereby conveyed to be forever held and used as a public park," upon the face of the

instrument, the grantee municipality did not acquire an absolute title to the fee in the premises. The court says: "It is not incumbent upon us at this time to determine the precise nature of the estate conveyed by this instrument, whether a new easement was acquired by the village, or an estate on condition or in trust. But we are obliged to consider the clause in connection with the remainder of the deed and to give it the effect intended, if that can be discovered and is reconcilable with the main purpose of the parties."

This court has held that "riparian rights being incident to land abutting on navigable waters can not be conveyed without a conveyance of such land, and such lands covered by navigable waters are subject to entry only by the owner of land abutting thereon." *Zimmerman v. Robinson,* 114 N. C., 39.

We are of the opinion that the grant to Morehead and Arendell of Square 83 operated to give to them an exclusive right or easement therein as riparian owners and proprietors to erect wharves, etc.; that when they ceased to be the owners of the land, by conveyance to the Shepard's Point Land Company, such easement passed as appurtenant thereto, and that it has passed by the several conveyances of the land as appurtenant to Square No. 1; that such easement passed to the defendant company, and the plaintiff has no such title to the soil under the navigable water as entitles it to maintain this action.

We are aware that this opinion is in conflict with many cases cited from other States, but we have given them careful consideration, and, in the absence of any controlling authority in this State, we think the conclusion to which we have arrived is consistent with the terms of the grant and the well settled policy of this State.

There must be a
New Trial.