IN THE MATTER OF THE PROTEST OF CLYDE MASON, JR., EX REL. THE PROPOSED LEASE OF JOSEPH A. HUBER

No. 8510SC122

(Filed 3 December 1985)

1. **Waters and Watercourses § 7— shellfish cultivation lease—no natural shellfish beds—insufficient evidence**

   The trial court did not err in reversing a decision of the Marine Fisheries Commission to grant a shellfish cultivation lease in Core Sound on the issue of whether there was sufficient evidence to determine that the area did not contain a natural shellfish bed where N.C.G.S. 113-202 (1983) provides that no lease may be granted which embraces a known or suspected natural shellfish bed; the Commission's regulations define a natural shellfish bed as an area of public bottom where ten bushels or more of shellfish per acre are to be found growing; an investigation in 1982 revealed that the bottom of the proposed lease area was sand and mud, there was no significant rooted vegetation, the area was totally exposed to wind, and the clam density was less than ten bushels per acre; a second investigation one year later only surveyed the area outside the proposed lease because Huber, the proposed lessee, had planted

two and one-half million clam seeds and had placed protective mats and stakes over the leased area; the Commission found that this proposed lease overlapped another proposed lease which had been denied as containing a natural shellfish bed, that clams are mobile and migrate, that conditions in the two areas differ significantly, and that Huber had carefully avoided natural shellfish beds; and the Commission concluded that the proposed lease area did not contain a natural shellfish bed. The Commission may not adopt an objective ten bushels per acre standard and apply a subjective standard that considers an area's substrate, vegetation, and wind exposure; thus, because Huber's mats prevented a proper investigation, the Commission had insufficient evidence in the record to conclude that the area did not contain a natural shellfish bed. 15 NCAC 3c.0302(a)(2) (1983).

**2. Waters and Watercourses § 7— shellfish cultivation lease—no interference with riparian rights**

The trial court erred in its reasoning when reversing a Marine Fisheries Commission decision to issue a shellfish cultivation lease by concluding that the lease constituted a taking of Mason's riparian rights without compensation. The lease as issued contained conditions designed to guard the public's and Mason's right of navigation and recreation in the riparian area, conditions which protected Mason's access to deep water, and a setoff which recognized Mason's right to make reasonable use of the water as it flowed past the shore. However, the result reached by the court was affirmed on other grounds. G.S. 113-202(d).

APPEAL by respondent from *Bailey, Judge.* Judgment entered 9 August 1984 in Superior Court, WAKE County. Heard in the Court of Appeals 18 September 1985.

*Wheatly, Wheatly, Nobles & Weeks, P.A., by Stevenson L. Weeks, for petitioner appellee Clyde Mason, Jr.*

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Daniel F. McLawhorn, for respondent appellant Marine Fisheries Commission.*

BECTON, Judge.

This case began with the application of Joseph A. Huber to the Marine Fisheries Commission (Commission) to lease public bottom land in Core Sound for clam culture. Clyde Mason, Jr., protested the proposed lease. On 14 April 1984, after an administrative hearing and a final agency hearing, the Commission ordered that the lease be issued to Huber with certain conditions. Following is a more detailed recitation of the facts and procedural history in this case.

I

On 9 July 1982, Huber submitted an application for a lease for shellfish cultivation in a 1.8 acre area of the public bottom of Core Sound, Carteret County, North Carolina. Two years earlier, Charles Edwards' application for a shellfish cultivation lease for approximately 1.18 acres in the same area of Core Sound had been denied based on the findings and conclusions of a shellfish biologist of the Division of Marine Fisheries (Division). The biologist investigated the Edwards site in October 1980 and concluded that it had "good potential for natural clam production and is acceptable to the public," that clams present at the site were "in sufficient quantities to be valuable to the public," and that the site contained a natural shellfish bed.

Huber's lease application included a map of the proposed area to be used for clam culture. The map showed that the area would begin at the highwater mark of Core Sound and extend outward in such a way as to overlap Mason's area of riparian access across the Sound. The water depth in this area varies from zero at the shore side of the lease area to a depth of one and one-half to four and one-half feet at the waterward side. It is not disputed that Mason owned the riparian rights involved herein, that Core Sound is navigable, or that Mason's riparian area is overlapped by the proposed lease area.

On 11 October 1982, the Chairman of the Commission notified Huber that his application would be deferred until a legislative moratorium on shellfish leases expired on 30 June 1983. The General Assembly enacted Chapter 621 of the 1983 Session Laws, to be effective 1 July 1983, establishing additional minimum criteria for shellfish leases, authorizing the Commission to modify lease applications and impose conditions, and retaining the requirement that no lease area contain a natural shellfish bed.

On 2 August 1983, after the moratorium on leases expired, the Division attempted to conduct another investigation of the lease area. The original investigation was approximately one year old, and clam populations are mobile. Huber had been in possession of the area, however, and he had planted two and one-half million clam seeds in the area and had placed plastic mats with stakes and weights over the area to protect the clams from predators. There were at least sixty stakes projecting out of the water.

The inspector for the Division, along with Huber, "did a random survey inside and outside the proposed lease with the standard clam rakes, [and] there appeared to be little or no change in the clam densities outside the proposed lease."

On 22 September 1983, the Commission approved Huber's proposed lease (which had been amended on 15 September 1983). On 7 October 1983, Mason requested an administrative hearing. An administrative hearing was held, and the hearing officer issued a proposed order on 14 March 1984. The Commission then held a final hearing. It reviewed the entire record, including the findings and conclusions of the administrative hearing officer, and it issued a final order on 14 April 1984 granting to Huber a lease subject to several specific conditions.

Mason petitioned the superior court to review the Commission's decision under N.C. Gen. Stat. Sec. 150A-43 (1983) (recodified at G.S. Sec. 150B-43 (1985)). In the petition, Mason included a recitation of the facts in the case, some of which varied from the findings of the Commission. The trial court issued its own findings of fact and conclusions of law and held that (1) the Commission violated the United States and North Carolina Constitutions by issuing the lease to Huber because it constituted a taking of the vested riparian rights of Mason for a private purpose without compensation; and (2) the Commission exceeded its authority under N.C. Gen. Stat. Sec. 113-202 (1983). The trial court reversed the Commission's order and denied the issuance of the lease.

The Commission appeals, asserting that the trial court erred by (1) failing to accept the Commission's findings of fact when they were supported by the record; (2) failing to base its judicial review on the "whole record"; (3) improperly and erroneously concluding that riparian access areas must extend to the nearest federally maintained channel; and (4) erroneously concluding that Mason's riparian rights were taken and that he was entitled to compensation. We disagree with the Commission on its first two assignments of error, and we hold that the trial court properly reversed the Commission's order. But we agree with the Commission on its last two assignments of error, and we modify the reasoning of the trial court to the extent it relies on the conclusion that Mason's riparian rights were taken.

## II

[1]    Petitioner contends that the trial court erred in substituting its own findings of fact for the Commission's when the Commission based its findings on competent, material and substantial evidence. We agree that such a practice is prohibited. *See In re Appeal of AMP, Inc.*, 287 N.C. 547, 215 S.E. 2d 752 (1975). Nevertheless, we conclude that the trial court did not commit this error.

In order to issue a lease for the cultivation of shellfish in underlying fishing coastal waters, the Commission must comply with the requirements of N.C. Gen. Stat. Sec. 113-202 (1983) (some subsections were revised in 1985, but the revisions became effective on 1 July 1985 and do not apply in this case). The lease involved in this case was issued in 1984 and is within the purview of this statute. *See* G.S. Sec. 113-202(p). G.S. Sec. 113-202 provides in part:

> (a) To increase the use of suitable areas underlying coastal fishing waters for the production of shellfish, the Marine Fisheries Commission may grant shellfish cultivation leases to persons who reside in North Carolina under the terms of this section when it determines the public interest will benefit from issuance of the lease. Suitable areas for the production of shellfish shall meet the following minimum standards:
>
> (1) The area leased must be suitable for the cultivation and harvesting of shellfish in commercial quantities.
>
> (2) The area leased must not contain a natural shellfish bed.
>
> (3) Cultivation of shellfish in the leased area will be compatible with lawful utilization by the public of other marine and estuarine resources. Other public uses which may be considered include, but are not limited to, navigation, fishing and recreation.
>
> (4) Cultivation of shellfish in the leased area will not impinge upon the rights of riparian owners.
>
> *      *      *
>
> (b) The Marine Fisheries Commission may delete any part of an area proposed for lease or may condition a lease to

> protect the public interest with respect to the factors enu-
> merated in subsection (a) of this section.

If it is determined by the Secretary "that granting the lease
would benefit the shellfish culture of North Carolina,"

> the Secretary, in the case of initial applications, must order
> an investigation of the bottom proposed to be leased . . . to
> determine whether the area proposed to be leased is consist-
> ent with the standards in subsection (a) and any other ap-
> plicable standards under this Article and the regulations of
> the Marine Fisheries Commission.

G.S. Sec. 113-202(d). Apparently, the legislature is concerned that
private, commercial shellfish cultivation might infringe upon
natural shellfish beds, which are open to the public. The same
statute provides that "no lease may be granted which embraces a
known or suspected natural shellfish bed." G.S. Sec. 113-202(g)
(relating to procedures upon receipt of a protest to a proposed
lease) (quoted language eliminated by 1985 amendments); *see also*
G.S. Sec. 113-202(e) (it is desirable to keep a leasehold "a sufficient
distance from any known natural shellfish bed" to prevent dis-
putes between a leaseholder and public clammers).

In the case at bar, the Department conducted two investiga-
tions. The first was on 30 August 1982, and it revealed that the
bottom proposed to be leased to Huber was composed of sand and
mud for the first third of the area, beginning with the shore side,
and coarse sand over the remaining two-thirds. There was no sig-
nificant rooted vegetation, and the area was totally exposed to
wind. The investigator also conducted a random survey of the bot-
tom land, using "a rake for forty-five minutes and tongs for ten
minutes," to determine clam density. The investigator reported
finding less than ten bushels of clams per acre and concluded that
the area would be "of little benefit to the public clammer and is
seldom utilized for public clam harvest."

The second investigation took place approximately one year
later, on 2 August 1983. Huber had planted two and one-half mil-
lion clams and had placed mats and stakes to protect the clams
from predators. Huber had notified the Commission of his inten-
tion to take possession of the proposed lease area pending the ter-
mination of the moratorium and the ultimate decision of the

Commission on his lease proposal. It is unclear whether the Commission approved this plan, although it is clear that it allowed its implementation. Thus, when the Division investigator went to reinspect the site of the lease, the proposed lease area was covered with the protective mats. The investigator conducted a random survey, using the technique described above, but he could only survey the area surrounding the proposed area.

In its Findings of Fact, the Commission detailed the results of the two investigations and found several other facts. Among these were, (1) the proposed Huber lease overlapped the proposed Edwards lease, which previously had been denied as containing a natural shellfish bed; (2) the conditions within the two areas differed significantly; (3) Huber had carefully avoided areas that were natural shellfish beds; and (4) clams are mobile—that is, they migrate. From the results of the two investigations, and satisfied with Huber's careful planning, the Commission concluded that the proposed Huber lease area did not contain a natural shellfish bed. The trial court reviewed the Commission's Findings, Conclusions and Order and held that, as a matter of law, the Commission failed to conduct a proper investigation as required by statute and, therefore, had insufficient evidence to conclude that there was no natural shellfish bed in the Huber proposed lease area. We agree.

The statute requires an investigation to determine whether a natural shellfish bed exists within the bounds of the area proposed to be leased. The statute defines a "natural shellfish bed" as "an area of public bottom where oysters, clams, scallops, mussels or other shellfish are found to be growing in sufficient quantities to be valuable to the public." N.C. Gen. Stat. Sec. 113-201.1(1) (1983). The Commission's regulations further define natural shellfish bed as "an area of public bottom where 10 bushels or more of shellfish per acre are found to be growing." 15 NCAC 3c.0302(a)(2) (1983). This appears to be the standard under which the investigators of the Huber site operated. The statute specifically requires that the Commission's regulations, as well as the statutory requirements, be followed in conducting the investigation and in making the determination of acceptability of a proposed site under G.S. Sec. 113-202(a). Thus, before a lease may be approved, there must be a finding under the Commission's reg-

In re Protest of Mason

ulatory standards that the site contains less than ten bushels of shellfish per acre.

The difficulty in applying these requirements is a result of the fact that neither the statutes nor the regulations specify a time period within which the investigation must be conducted. In the case at bar, the only survey of the bottom area inside the Huber site boundaries was conducted in August 1982 because the August 1983 investigation was hampered by Huber's mats and stakes. The trial court found that an investigation and survey for shellfish is of little value when it is conducted one year before the determination of whether a natural shellfish bed is present at the site. The court's conclusion was based on what the Commission in this case found as fact: "Clam populations are mobile and may be present in one location one year and gone the next."

One must keep in mind that a natural shellfish bed was found in Edwards' proposed site, which is adjacent to the Huber site, in December 1980. In fact, Huber at all times asserted that in planning his lease area he had to carefully avoid the nearby areas where clams naturally cultivate. The Huber site may have become a natural shellfish bed, despite the adverse physical realities of the area, if the clams from the nearby natural bed migrated through the Huber area. In any event, the Commission did not adopt a "physical characteristics" standard for determining the presence of natural shellfish beds. It chose an objective "ten bushels per acre" standard. The investigator in August 1983 used the "ten bushels per acre" standard when he attempted to conduct the necessary survey.

Although this is a close case, we conclude that without the results of a proper and timely survey, the Commission's regulations and the minimum requirements of G.S. Sec. 113-202 cannot be satisfied. The Commission may not adopt in its regulations one standard (an objective "ten bushels per acre" standard) and then apply another (a subjective standard that considers an area's substrate, vegetation and wind exposure). Were we to hold otherwise, lease applicants would be encouraged to possess marginal areas before investigations could be conducted, and the Commission would be permitted to condone this activity by granting leases without complying with the letter or spirit of the statute and its affiliated regulations.

Respondent contends that the trial court erred in substituting its own findings of fact for the Commission's by finding that mats and stakes prevented a proper investigation and that there was insufficient evidence for the Commission to conclude that no natural shellfish bed existed on the lease site. Respondent argues, "The planted beds obviously could not and did not include a natural shellfish bed since it had mats obstructing access to the area." The logic of this argument escapes us. The purpose of the investigations is to be sure there are no natural shellfish beds at the sites where artificial beds will be placed so that only non-productive public bottom areas will be converted to productive commercial areas. To allow the unauthorized planting of artificial beds before investigations, and then conclude that there must be no natural beds at the mat-obstructed sites, would defeat the purpose of the statute. We simply would not know if the artificial beds were planted on top of natural beds. Clearly, the planting must await the determination of the absence of a natural bed; otherwise, the determination is a foregone conclusion. Thus, because Huber's protective mats prevented a proper investigation, the Commission had insufficient evidence in the record, taken as a whole, to conclude that the area did not contain a natural shellfish bed. *Cf. In re Broad and Gales Creek Community Association*, 300 N.C. 267, 266 S.E. 2d 645 (1980). The Commission erred in circumventing this requirement. The trial court did not err in reversing the Commission on this issue. *See* N.C. Gen. Stat. Sec. 150A-51 (1983) (revised and recodified at G.S. Sec. 150B-51 (1985)).

### III

[2] The trial court did not rely solely on the Commission's failure to conduct a proper investigation of the proposed lease area in reversing the agency decision. The court also concluded that the granting of the proposed lease constituted a taking of Mason's riparian rights for a private purpose without compensation, in violation of the United States and North Carolina Constitutions. For the reasons set forth below, we reverse the trial court on this issue and modify the bases for the court's reversal of the Commission to include only the ground discussed and affirmed in Part II, *supra.*

Riparian rights are vested property rights that cannot be taken for private purposes or taken for public purposes without

compensating the owner, and they arise out of ownership of land bounded or traversed by navigable water. *Shepard's Point Land Co. v. Atlantic Hotel,* 132 N.C. 517, 536, 44 S.E. 39, 45 (1903). In *Shepard's Point Land Co.,* the Supreme Court stated with approval:

Lewis on Eminent Domain, sec. 83, says: "The following rights may be enumerated as appurtenant to property upon public waters:

"1. The right to be and remain a riparian proprietor and to enjoy the natural advantage thereby conferred upon the land by its adjacency to the water.

"2. The right of access to the water, including a right of way to and from the navigable parts.

"3. The right to build a pier or wharf out to the navigable water, subject to any regulations by the State.

"4. The right to accretions or alluvium.

"5. To make reasonable use of the water as it flows past or laves the shore."

*Id.* at 538, 44 S.E. at 46. The State may regulate, protect and promote the shellfish industry and protect the public rights in navigable waters. *Capune v. Robbins,* 273 N.C. 581, 160 S.E. 2d 881 (1968); *Bond v. Wool,* 107 N.C. 139, 12 S.E. 281 (1890); *Oglesby v. McCoy,* 41 N.C. App. 735, 255 S.E. 2d 773, *disc. rev. denied,* 298 N.C. 299, 259 S.E. 2d 301 (1979). The legislature vested the authority to promote the shellfish industry in the Marine Fisheries Commission, but it also mandated that the Commission may not lease a bottom area if the lease would impinge upon riparian rights. G.S. Sec. 113-202(a)(4).

The trial court in the case at bar concluded that Mason's riparian rights were seriously encumbered in that the lease would interfere with Mason's rights to "navigation, recreation, access to the navigable portions of Core Sound, potential future accretions and all other rights of usage to which petitioner is entitled . . . by virtue of his riparian ownership." We believe the Commission properly and conscientiously considered the potential conflicts between the proposed lease and Mason's riparian rights, and the

trial court erroneously concluded that the lease, as issued, would impinge upon Mason's riparian rights.

As an initial matter, we note that the trial court consistently used the proposed lease area, rather than the area defined by the lease as issued, in evaluating the extent of the conflict with the riparian rights. The proper area to consider is the area covered by the lease as issued, with the conditions imposed by the Commission. These conditions are explicitly authorized by the legislature:

> In the event the Secretary finds the application inconsistent with the applicable standards, the Secretary shall recommend that the application be denied *or that a conditional lease be issued* which is consistent with the applicable standards.

G.S. Sec. 113-202(d) (emphasis added). And, if a protest is filed, "[t]he Marine Fisheries Commission may impose special conditions on leases so that leases may be issued which would otherwise be denied." *Id.* Sec. 113-202(h) (quoted language eliminated by 1985 amendments). The Commission used this authority to impose the following conditions:

1. All stakes must be a minimum of nineteen feet apart;

2. All stakes should be at a height clearly visible to boaters;

3. The matting must be maintained so as not to pose a threat to navigation;

4. The lease area must be set back at least 100 feet from the Protestant's shoreline as shown in Protestant's Exhibit 21; and

5. That portion of the lease area within the limits of the Protestant's areas of riparian rights shall be made subject to the lawful exercise of those rights including the right to build a pier for access to navigable waters within the lease. Upon six months notice that the Protestant or his successor in interest, has obtained the necessary permits for and intends to build a pier within the lease area, the leaseholder shall remove all equipment which interferes with the pier and reasonable access to the pier.

The first three conditions were designed to guard the public's right of navigation and recreation (including Mason's) as

required by G.S. Sec. 113-202(a)(3). The Commission recognized the problem:

> On the proposed lease site, the number of stakes, if unregulated as to proximity and height, could pose an impermissible obstruction to navigation in an area commonly plied by boats eighteen to twenty-three feet long, Finding of Fact 4(e). While the Commission requires lease boundary stakes no further than fifty yards apart, 15 NCAC 3C.0305(a)(3), it sets no minimum distance for stakes generally.

And it concluded that the conditions, combined with the protection already afforded the public under N.C. Gen. Stat. Sec. 76-40(a) (prohibiting deposit of various wastes in navigable water) and (c) (1981) (prohibiting abandonment of structures on floor of navigable waters), would render "such matting and stakes . . . compatible with other public uses of the area." The fourth condition, requiring a one hundred foot set-off, also protects the public's right and Mason's right to navigation and recreation in the riparian area. The set-off, based upon 15 NCAC 3c.0302(a)(3), recognizes Mason's right to make reasonable use of the water as it flows past the shore. *See O'Neal v. Rollinson*, 212 N.C. 83, 192 S.E. 688 (1937); *Shepard's Point Land Co.*

The final condition imposed by the Commission protected Mason's right to access to "deep" or "navigable" water. The Commission concluded that the lease as proposed "could interfere with [Mason's] riparian right to build a pier or other structure out to deep water." The Commission noted, however, that Mason's Exhibit 22 (the map) did not, as a matter of law, show Mason's area of riparian access because it extended the area of access to the federal channel. The Commission nevertheless found that the proposed lease area generally extends substantially waterward of Mason's property. The trial court specifically found:

> 7. The riparian area of petitioner's land is that area included within parallel lines drawn from the perpendicular to the water course as established by the NOAA Chart aforesaid to the termini of petitioner's land lines at the highwater mark as shown by protestant's Exhibit 22.

Exhibit 22 shows the riparian area extending all the way to the federally maintained channel.

As the Commission correctly noted, the riparian access zone does not necessarily extend this far. It only extends as far as necessary to provide access to the "navigable parts" of the waterway. *See Shepard's Point Land Co.*, 132 N.C. at 538, 44 S.E. at 46. Thus, the question becomes: What is navigable? In this State, "all water courses are regarded as navigable in law that are navigable in fact." *State v. Baum*, 128 N.C. 600, 604, 38 S.E. 900, 901 (1901). "The navigability of a watercourse is therefore largely a question of fact for the jury, and its best test is the extent to which it has been so used by the public when unrestrained." *Id.* Thus, the Commission was correct in concluding that the right of access to "navigable" water in the case at bar depended upon "the context of the actual shoreline, the sound, and local usage." We further point out that the lateral boundaries of the zone of riparian access should be determined in accordance with the Coastal Area Management Act (CAMA) regulation 15 NCAC 7h.0208(b)(6)(F) (1983) (concerning the proper placement of piers that may interfere with adjacent property owner's riparian access area):

> The line of division of areas of riparian access shall be established by drawing a line along the channel or deep water in front of the properties, then draw a line perpendicular to the line of the channel so that it intersects with the shore at the point the upland property line meets the water's edge.

Here we note that these imaginary lines drawn from the channel or deep water represent the lateral boundaries between access zones and do not represent the distance each zone extends away from the shore. Each access zone extends only as far as necessary to ensure access to navigable waters, as described above.

Even though the findings of the Commission indicate that the small craft customarily used in the proposed lease area are able to navigate up to the shore, there was no error in the Commission's conclusion that Mason is entitled to some access to deeper water through the area of the proposed lease. Otherwise, Mason would be boxed in. The Commission was well within its authority to condition the lease on the provision of this zone of access. *See* G.S. Sec. 113-202(d), (h). Mason argues that this condition—that Huber's lease be subject to Mason's right to build a pier through the lease area—is in conflict with CAMA regulation 15 NCAC

7h.0208(b)(6)(G) which provides that docks and piers shall not significantly interfere with shellfish franchises or leases. In the case at bar, however, the lease as issued expressly excluded from the lease area the area to be used for a pier. In other words, the lease areas with which the pier would interfere were removed from the lease to avoid any conflict.

## IV

In summary, we do not believe that the lease issued by the Commission infringed upon Mason's riparian rights. Had a proper investigation been conducted, the lease as issued would have been proper. Thus, the result reached by the trial court is affirmed, but the reasoning is modified to the extent that it relies on the conclusion that Mason's riparian rights were impaired.

For the reasons set forth above, we affirm the result and modify the reasoning of the trial court.

Modified and affirmed.

Judges WEBB and MARTIN concur.