# KLAMATH AND MOADOC TRIBES OF INDIANS ET AL. *v.* UNITED STATES.

No. 30. Argued November 12, 1935.—Decided December 9, 1935.

*Mr. G. Carroll Todd,* with whom *Messrs. Daniel B. Henderson, C. M. O'Neill,* and *T. Hardy Todd* were on the brief, for petitioners.

*Assistant Attorney General Blair,* with whom *Solicitor General Reed* and *Messrs. George T. Stormont* and *Wilfred Hearn* were on the brief, for the United States.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This suit was brought under an Act of May 26, 1920,[1] conferring jurisdiction of claims asserted by plaintiffs against the defendant. It provides: " That all claims of whatsoever nature " the plaintiffs may have against the United States " which have not heretofore been determined by the Court of Claims " may be submitted to that court for determination of the amount, if any, " due said Indians from the United States under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds of said Indians, or for the failure of the United States to pay said Indians any money or other property due; and jurisdiction is hereby conferred upon the Court of Claims, with the right of either party to appeal to the Supreme Court of the United States, to

[1] 41 Stat. 623.

hear and determine all legal and equitable claims, if any, of said Indians, against the United States, and to enter judgment thereon " (§ 1); that if any claim be submitted to said courts they shall settle the rights therein, both legal and equitable, " notwithstanding lapse of time or statutes of limitation, and any payment which may have been made upon any claim so submitted shall not be pleaded as an estoppel, but may be pleaded as an offset in such suits or actions . . ." § 2.

The claim in suit is for the value of plaintiffs' rights in respect of about 87,000 acres, which, less an admitted payment, is alleged to be $5,891,250. The answer is a general traverse. At the trial much evidence was taken and the contentions of the parties were fully presented. The court made findings of fact, stated its conclusions of law and dismissed the case.

The questions for decisions are:

Whether, assuming that before its passage plaintiffs gave defendant a valid release of the claim in suit, the Act empowers the court to adjudicate that claim.

Whether the facts found are sufficient to show that the release given is invalid.

The findings are sufficiently reflected by the following narration. In 1864 plaintiffs held by immemorial possession more than 20,000,000 acres located within what now constitutes Oregon and California. By an Act [2] of March 25 of that year the President was authorized to conclude with them a treaty for the purchase of the country they occupied. The treaty was made October 14 following.[3] A proviso sets apart a tract within the ceded country, to be held until otherwise directed by the President, as a residence for plaintiffs, with specified privileges. Rights

[2] 13 Stat. 37.

[3] Ratified July 2, 1866; proclaimed February 17, 1870.    16 Stat. 707.

of way for public roads were reserved.[4]   Shortly before
the treaty was made Congress granted Oregon, to aid in
the construction of a road from the city of Eugene to the
eastern boundary of the State, the odd-numbered sec-
tions for three in width on each side of the proposed
road.[5]   Oregon accepted the grant and assigned it to a
road company which undertook to construct the road.
Congress recognized the assignment.[6]   Patents were is-
sued to the State and to the road company for in all
420,240.67 acres, title to which was later acquired by a
land company.   Exclusive of right of way, 111,385 acres
so acquired by that company were within the boundaries
of the reservation and had been allotted in severalty to
members of the tribe.

The Act of March 2, 1889,[7] directed suit by the United
States to forfeit the grants for non-compliance with the
specified conditions, saving, however, the rights of bona
fide purchasers.   The company's title was held valid.
*United States* v. *California & Oregon Land Co.*, 148 U. S.
31.   Then the United States brought another suit to re-
cover the part of the lands within the reservation on the
ground that by the terms of the grant they were expressly
excepted.   But, as that issue could have been raised in
the first suit, it was held *res adjudicata*.   *United States* v.
*California & Oregon Land Co.*, 192 U. S. 355.

The Secretary of the Interior reported the result of the
litigation and expressed the opinion that the Indians
should have compensation.   Congress by an Act of June
21, 1906,[8] authorized the Secretary to exchange unallotted
lands in the reservation for the allotted lands earlier con-

---

[4] 16 Stat. 708.
[5] Act of July 2, 1864, 13 Stat. 355.
[6] Act of June 18, 1874, 18 Stat. 80.
[7] 25 Stat. 850.
[8] 34 Stat. 325, 368.

veyed. The Secretary made an agreement with the land company pursuant to which on August 22, 1906, it conveyed the 111,385 acres back to the United States and in return the latter conveyed 87,000 acres of unallotted lands to the company. That transfer was made without the knowledge or consent of plaintiffs and without giving them any compensation for the lands so taken from their reservation.

As found below, the value of plaintiffs' title was then $2,980,000.[9] An Act of April 30, 1908,[10] appropriated $108,750 to be deposited in the Treasury to the credit of the Indians and to be expended for their benefit. A proviso declares: " That this appropriation shall not be effective until said Indians, through the usual channels, shall execute a release of any claims and demands of every kind against the United States for the land involved."

The Indian population on the reservation was then 1,038, including 640 adults of whom 287 were men. The adult males alone were allowed to vote in Indian councils. The superintendent called a council to assemble at the general agency on December 5, 1908, for the purpose of considering compliance with the Act. The Indians were by the superintendent given timely notice in the usual way. The council, assembled in pursuance of the notice, was attended by 200 or more Indians. The superintendent presided and through an interpreter explained the terms of the measure and what would have to be done to get the appropriated money. There was some opposition, but the release was signed by 100 or more Indians present. The superintendent " neither did nor said anything to mislead the assembly." Forty or fifty miles from

---

[9] The court allowed counterclaims set up by defendant amounting to $1,978,431.24.

[10] 35 Stat. 70, 92.

the general agency there was a sub-agency at Yainax. The Indians in that section rarely attended councils at the general agency headquarters. The superintendent called another council at that place. In general the proceedings were the same as before; at that meeting others signed. In the end the release was signed by 150 adult males of the tribes on the reservation.

January 6, 1909, the Secretary received the release from the superintendent. In form it complied with the requirements of the Act and concluded: " Now, therefore, the undersigned, being a majority of the Indians of the Klamath Reservation in council assembled, do hereby relinquish any and all claims and demands of every kind and character which they now have or may hereafter have against the United States for the lands involved." The Secretary accepted it as sufficient compliance with the Act, and accordingly $108,750 was placed in the Treasury to the credit of the plaintiffs. Except by the petition in this suit, they have made no claim for additional compensation.

1. The jurisdictional Act is a special law passed for the benefit of plaintiffs upon consideration of their application for relief. Their memorial specified other claims but made no reference to the one before us. There is nothing in what they presented (see H. Rep. No. 672, 66th Cong., 2d Sess., p. 8), the reports of the committees or the Act itself to identify, or to indicate that they wanted to have determined, any claim for compensation for their right to the 87,000 acres conveyed by the United States to the land company. Their failure, between the settlement in 1909 and the suit in 1925, to seek further payment and their omission to mention this very large demand, when seeking congressional action in their favor, makes strongly against their contention that the jurisdictional Act was intended to cover this claim. Cf. *United States* v. *Creek Nation,* 295 U. S. 103, 108–109.

The meaning of the general language of § 1 that "all claims of whatsoever nature" which plaintiffs have against the United States "may be submitted" is limited by the clause "which have not heretofore been determined by the Court of Claims," and is further much narrowed by the definitions of the classes of claims meant to be included. And correspondingly restrained is the meaning of the phrase "all legal and equitable claims" in the clause conferring jurisdiction upon the court "to hear and determine." Thus the privilege of plaintiffs to submit and the power of the court to determine are made coextensive. The Act grants a special privilege to plaintiffs and is to be strictly construed and may not by implication be extended to cases not plainly within its terms. *Schillinger* v. *United States,* 155 U. S. 163, 166. *Price* v. *United States and Osage Indians,* 174 U. S. 373, 375. *Blackfeather* v. *United States,* 190 U. S. 368, 376.

This claim is plainly not, within the meaning of § 1, for an amount due under treaty, agreement or law of Congress or for misappropriation of funds of the Indians. Plaintiffs maintain that it is covered by the clause: "for the failure of the United States to pay said Indians any money or other property due." There is here involved no question as to the adequacy of that language to cover any of the claims referred to in plaintiffs' application to the Congress; we are considering whether it extends to this claim assuming that prior to the enactment it had been effectively released. If the release stands, no money or property is due plaintiffs, for the settlement and release wiped out the claim. If the Act is sufficient to give jurisdiction of this claim, then it permits plaintiffs to bring into the Court of Claims for determination *de novo* all claims, whether released or not, that they ever had against the United States, excepting only those already there determined. It goes without saying that, if Congress in-

tended to grant so sweeping and unique a privilege, it would have made that purpose unmistakably plain. As shown in the opinion below, Acts intended to waive settlements employ terms quite different from the provisions under consideration.[11]

Plaintiffs turn for support to the provision of § 2 which prevents "payment . . . upon any claim" from being pleaded as an estoppel but permits it to be asserted as an offset. And they insist that, if this clause does not relate to payments made and accepted as being in full, it means nothing. But that contention is based on a misunderstanding of the language used. Payment upon a claim means payment on account or in part as distinguished from one made and accepted as payment in full. The quoted provision made no grant of jurisdiction; it was inserted merely to eliminate defenses. Neither it nor any other part of § 2 may be held to add claims to those

---

[11] For instances where Congress authorized submission to the Court of Claims of Indian claims theretofore settled or adjusted, see Act of February 7, 1925, 43 Stat. 812, as amended March 3, 1927, 44 Stat. 1358: "The said courts shall consider all such claims de novo . . . and without regard to any decision, finding, or settlement heretofore had in respect of any such claims"; construed in *Delaware Tribe* v. *United States,* 72 Ct. Cls. 483; *id.* 525; 74 Ct. Cls. 368. Act of March 3, 1881, 21 Stat. 504: Under a treaty of 1855, 11 Stat. 611, a determination had been made by the Senate and account was stated by the Secretary of the Interior. The Act authorized the court "to review the entire question of differences de novo" and declared that "the court shall not be estopped by any action had or award made by the Senate." Construed in *Choctaw Nation* v. *United States,* 19 Ct. Cls. 243; 119 U. S. 1, 29. Cf. statutes authorizing submission of claims not theretofore finally settled and released: Acts of February 11, 1920, 41 Stat. 404; June 3, 1920, 41 Stat. 738; March 19, 1924, 43 Stat. 27; May 20, 1924, 43 Stat. 133; May 24, 1924, 43 Stat. 139; June 4, 1924, 43 Stat. 366; June 7, 1924, 43 Stat. 537; June 7, 1924, 43 Stat. 644; February 7, 1925, 43 Stat. 812; March 3, 1925, 43 Stat. 1133; May 14, 1926, 44 Stat. 555; July 2, 1926, 44 Stat. 801; July 3, 1926, 44 Stat. 807; March 2, 1927, 44 Stat. 1263; March 3, 1927, 44 Stat. 1349.

covered by the language of § 1.  As jurisdiction will not be extended beyond the terms of the Act by any implication or other resort to construction, no force can be given to plaintiffs' suggestion that intention to include claims already settled and released is shown by the clause in § 2 allowing defendant credit for money it expended for plaintiffs.

Plaintiffs say the committees recommended inclusion of a released claim and suggest that therefore the intention of Congress was to include the one in suit.  Plaintiffs brought that claim forward; it arose under the Treaty of October 14, 1864, and involved questions concerning boundaries of the reservation meant to be defined by the treaty and boundaries as attempted to be established by surveys, and whether the release referred to extends to the area in respect of which the claim is asserted.  The circumstances attending the enactment might be thought to have favorable bearing as to that claim.  But as shown above plaintiffs' failure to disclose that it had and wanted to submit the claim in suit supports defendant's contention that the court below was without jurisdiction.

2. Have plaintiffs shown the release invalid?

The question is not whether under the circumstances disclosed the United States may set up the release as a defense.  It is whether the special Act brings the claim within the court's jurisdiction.  As this claim, if released, is not covered, it follows that in the court below the burden was on plaintiffs to prove the absence of valid release, and that here their burden is to show that, as a matter of law, the facts found compel the conclusion that the release given is not valid.  It is to be remembered that the Act of April 30, 1908, was passed by Congress in the exertion of its untrammeled power in behalf of the United States to fix, as it deems appropriate and just under the circumstances, the amount of compensation to be paid the Indians for the rights of the plaintiffs lost by the tak-

ing of the 87,000 acres from their reservation. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 306, 308. *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565–566. *Choate* v. *Trapp*, 224 U. S. 665, 670–671. Cf. *United States* v. *Mille Lac Chippewas*, 229 U. S. 498, 506, 509–510. *United States* v. *Creek Nation, supra*, 110. They gave, and through the Secretary of the Interior the United States accepted, the release as sufficient to comply with the Act. It served to make the appropriation effective and was treated as fulfillment of the conditions upon which the money was paid into the Treasury to be disbursed from time to time for plaintiffs' benefit. In the absence of findings of fact requiring conclusion to the contrary, it is to be presumed that all things necessary to make the appropriation effective and the release valid were done regularly and in accordance with the expressed will of Congress. *United States* v. *Chemical Foundation*, 272 U. S. 1, 14–15.

The phrase " through the usual channels " is used in stating the condition without which payment would not have been made. There the expression is one of indefinite import. It does not necessarily mean the manner in which plaintiffs or other or all of the Indian tribes were then accustomed to make treaties or to negotiate other agreements with the United States. For aught that appears in the Act or findings of the court, " usual channels " may have been used to signify something less than the proceedings, if any there were, usually followed by plaintiffs or Indian tribes generally. If this ambiguous phrase be held to require adherence to custom, there is nothing in the findings to show what the custom was. They fail to show that anything required by the Act was omitted.

Plaintiffs contend that the release is invalid because obtained by duress. But duress will not be presumed; nor will it be inferred from incomplete, doubtful or ambiguous findings. There is nothing to suggest that, in

the making of the settlement, anything was done to over-reach plaintiffs. On the contrary, the circumstances disclosed by the findings tend quite strongly to indicate that the negotiations were fairly conducted.

Plaintiffs say that the plain inadequacy of the payment, when taken in connection with the unequal positions of the parties, is enough without more to invalidate the release. The findings show that the amount paid plaintiffs was less than four per cent. of the value of the land. It was grossly inadequate. Where, in litigation between private parties, a release of claim is by the party who gave it challenged as invalid, inadequacy of consideration coupled with lack of business capacity and inferiority of position in respect of the transaction or in relation to that of the other party are elements having significance. *Wheeler* v. *Smith,* 9 How. 55, 82. *Thorn Wire Co.* v. *Washburn & Moen Co.,* 159 U. S. 423, 443. But the rules that govern in such cases have no application in suits by these Indian tribes against the United States. The relation between them is different from that existing between individuals whether dealing at arm's length, as trustees and beneficiaries, or otherwise. See *Choctaw Nation* v. *United States,* 119 U. S. 1, 28. *Lone Wolf* v. *Hitchcock, ubi supra. Choate* v. *Trapp, ubi supra.* Regard being had to the nature of duties, resembling those arising out of the relation of guardian and ward,[12] owed by the United States to Indian tribes, and in view of the undoubted power of Congress to determine the amount and to fix the terms of payment of compensation for the rights lost to plaintiffs, it is clear that, in the absence of specific authorization, they may not avoid the release given in accordance with the Act upon the

[12] *United States* v. *Kagama,* 118 U. S. 375, 383–384. *Choctaw Nation* v. *United States,* 119 U. S. 1, 27, 28. *Jones* v. *Meehan,* 175 U. S. 1, 10–11. *United States* v. *Payne,* 264 U. S. 446, 448.

ground that the payment was too small. That would enable them to question the laws of Congress in fields where, because of the relationship referred to, they are supreme.

The obligation of the United States to make good plaintiffs' loss is a moral one calling for action by Congress in accordance with what it shall determine to be right. Save to the extent that Congress may authorize, the Government's dealings with Indian tribes are not subject to judicial review.[13] Even if judicially cognizable, as would be a like contention in ordinary litigation between individuals, plaintiffs' insistence that inadequacy of consideration invalidates the release could not here be sustained. That is so because the findings fail to show that any person acting for the United States deceived or misled plaintiffs as to the value of the land or, indeed, had knowledge of any fact bearing upon its value that was not well known by plaintiffs when they made the settlement and gave the release. Mere inadequacy of consideration is not enough. *Eyre* v. *Potter,* 15 How. 42, 59. Pomeroy, Equity Jurisprudence, 14th ed., § 926. Williston on Contracts, § 115.

As the Act does not extend to this claim if released, and as the facts found fail to establish invalidity of the release admittedly given, the jurisdictional Act does not extend to the claim in suit and the Court of Claims rightly dismissed the case. If plaintiffs are to have additional compensation, it must be obtained through legislation dealing with the merits or authorizing effective judicial determination.

*Affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.

---

[13] *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 567–568.