**GRANT et al. v. UNITED STATES.**
Civ. Nos. 372, 378, 379.

United States District Court
E. D. North Carolina,
Wilmington Division.

Sept. 1, 1950.

James & James, and Isaac C. Wright, all of Wilmington, N. C., Ed Summersill, Jacksonville, N. C., for plaintiffs.

John H. Manning, U. S. Atty., Raleigh, N. C., Howard H. Hubbard, Asst. U. S. Atty., Clinton, N. C., Logan D. Howell, Asst. U. S. Atty., Raleigh, N. C., for defendant.

GILLIAM, District Judge.

The plaintiffs in each of these cases allegedly suffered damages to their cultivated oyster beds on bottoms in Alligator Bay and Stump Sound, leased from the State of North Carolina, as a result of the dumping of sewage and laundry waste from Camp Davis into Goose Creek, Barlow Creek, and King Creek, which are tidal waters. The Government has filed a motion to dismiss under Rule 12(c), Federal Rules of Civil Procedure, 28 U.S.C.A., in each case, contending that the complaint does not state a claim upon which relief may be granted, and the actions were consolidated for hearing on these motions.

The Congress on April 20, 1949 passed the following special Act entitled:

"For the relief of Carlton C. Grant and others" (plaintiffs herein):

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the United States District Court for the Eastern District of North Carolina to hear, determine, and render judgment upon, notwithstanding the lapse of time or any provision of law to the contrary, all claims of Carlton C. Grant (and others) * * * against the United States for damages for injury to property resulting, at any time on or after May 1, 1941, from dumping of sewage and laundry waste from Camp Davis, North Carolina, into Goose Creek, Barlow Creek, and King Creek.

"Sec. 2. Proceedings for the determination of such claims shall be had in the same manner as in cases of which said court has jurisdiction under the provisions of section 145 of the Judicial Code,[1] as amended:

Provided, That suits hereunder shall be instituted within four months after the enactment of this Act: Provided further, That this Act shall be construed only to, waive immunity from suit of the Government of the United States and to confer jurisdiction upon said court to hear, determine, and render judgment upon the claims of the persons named in section 1 hereof, and not otherwise to affect any substantive rights of the parties."

These suits were brought within the four month period allowed by the Act.

The Government contends that the only effect of this special Act is to waive its immunity from suit and provide a forum where the question of liability may be determined; and that under the applicable principles of law the Government is not liable for any damages sustained by the plaintiffs; therefore, the actions should be dismissed. Plaintiffs contend that when the Act is construed in the light of its legislative history, the conclusion must be that the matter of liability is concluded, leaving only the question of the amount of damages for the Court to determine. And the plaintiffs further contend that regardless of this question they are entitled to recover their damages under the applicable principles of law.

It is clear that the Court may consider the legislative history of an act if its meaning is not clear upon its face. In fact, the modern view is to consider such history no matter how clear the meaning may appear to be. In Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407, it is said: "But words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination" ' ".

A consideration of the legislative history of this Act establishes the following facts:

During the 80th Congress Honorable Graham Barden, U. S. Representative of the District within which the oyster beds in question are located, introduced a bill

1. 1948 Revised Judicial Code, 28 U.S.C.A. § 1491 et seq.

entitled "For the relief of Carlton C. Grant and others", which proposed to authorize the Secretary of the Treasury to pay out of "any money in the Treasury not otherwise appropriated" to Carlton C. Grant and 41 others named in the Act, specific amounts "in full satisfaction of their respective claims against the United States for compensation for property damage to their cultivated oyster beds sustained by them as a result of the dumping of sewage and laundry waste from Camp Davis, N. C., which caused the pollution of the waters in which their cultivated oyster beds had been established, and resulted in the loss of their cultivated oysters." So that, the bill as introduced was an appropriation bill, and was so considered by the Committee on the Judiciary of the House, to which it was referred. The Committee in effect rejected the bill as introduced and reported favorably an amendment in the identical language of the Act finally passed at the 81st Session. It should be noted that the amendment reported out by the House Committee, identical with the Act finally passed, contained the names of the persons set out in the original bill, together with a number of additional claimants.

In reporting favorably on the amendment the House Committee stated in its report: "The purpose of the proposed legislation is to confer jurisdiction upon the United States District Court for the Eastern District of North Carolina to hear, determine and render judgment upon the claims of Carlton C. Grant and others for damages sustained as the result of the dumping of sewage and laundry waste in certain creeks by the United States Army at Camp Davis, N. C., from April 30, 1941, to July 1, 1947. Your Committee, having held hearings on this as an appropriation bill, is of the opinion that it is a claim that should be referred to the Courts for consideration. There is conflicting evidence and your Committee is not able to determine the damages. Therefore the bill has been amended to confer jurisdiction upon the District Court for the Eastern District of North Carolina."

While considering the bill introduced by Congressman Barden, same being H. R.

4128, the Committee had before it a letter from the Secretary of the Army, Mr. Kenneth C. Royall, in which the following statements were made: "The Department of the Army would have no objection to the enactment of H. R. 4128, 80th Congress, a bill for the relief of Carlton C. Grant and others, if it should be amended as hereinafter recommended. * * * Upon the evidence presently of record, which is far from sufficient in detail and scope for a complete consideration of the issues presented, the Department of the Army is not only not in a position to make any determination with regard to the validity of the claims which are now being urged against the Government, but is likewise not in a position to appraise the damages allegedly sustained by each of the 42 individual claimants named in H. R. 4128, which damages range from $37.50 to $9,375. In view of the highly controversial nature of the issues of fact and law involved, it is the opinion of the Department of the Army that substantial justice would best be assured both to the claimants and to the United States through the medium of a judicial determination by the United States Court of Claims. Accordingly, the Department of the Army would have no objection to the enactment of H. R. 4128 if it should be amended to read as follows:

"A Bill to confer jurisdiction on the Court of Claims to hear, determine, and render judgment on the claims of Carlton C. Grant and others against the United States of America

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claims of Carlton C. Grant (and others) against the United States of America for damages alleged to have been caused by the alleged negligent allowance by the United States Army authorities in charge of Camp Davis, North Carolina, of the discharge of sewage and laundry waste from said camp into Barlow Creek and Goose Creek and over and across certain oyster grounds situated in Stump Sound and Alligator Bay, North

Carolina, and alleged to have been leased by such persons from the State of North Carolina.

"Sec. 2. Proceedings for the determination of such claims shall be had in the same manner as in cases of which said Court has jurisdicton under the provisions of section 145 of the Judicial Code, as amended: Provided, That suits hereunder shall be instituted within four months after the enactment of this Act: And provided further, That this Act shall be construed only to waive the immunity from suit of the Government of the United States and to confer jurisdiction upon said court to hear, determine, and render judgment upon the claims of the persons named in section 1 hereof, and not otherwise to affect any substantive rights of the parties."

The House Committee also had before it a report of an investigation made by Dr. Herbert F. Prytherch, Aquatic Biologist in charge of the United States Fishery Biological Laboratory at Beaufort, N. C., and a letter from Dr. Prytherch to Congressman Barden, in which he wrote: "Since several hundred thousand gallons of laundry waste were discharged daily into Stump Sound, it is my opinion that these toxic chemicals were entirely responsible for the destruction of the valuable oyster crop in that general area."

The amendment reported out by the House Committee (which, as noted above, is identical with the act now in effect, except as to the names of the individual claimants listed) was passed by the House of Representatives of the 80th Congress, but no action was taken by the Senate before adjournment.

At the 81st Congress a bill identical with the amendment reported out by the House Committee of the 80th Congress was passed by both houses of Congress, and is the Act in question. The House Committee on the Judiciary of the 81st Congress had before it all the documents and letters which were before the House Committee of the 80th Congress.

With an eye on the wording of the Act itself, and also on the legislative history above outlined, the first important question to determine is whether Congress intended (a) only to "waive immunity from suit of the Government of the United States and to confer jurisdiction upon said court to hear, determine, and render judgment upon the claims of the persons named * * * and not otherwise to affect any substantive rights of the parties" as the Act itself expressly states, or (b) to waive immunity, confer jurisdiction, and in addition recognize a liability even though otherwise non-existent under the law, leaving open for the determination of the Court only the question of the amount of the damages sustained by each claimant.

The Government insists that there can be no substantial doubt as to the proper construction of the Act, since the Act itself indicates the construction to be put upon it by providing: "This Act shall be construed only to waive immunity and not otherwise to affect any substantive rights of the parties;" and that the letter of Secretary Royall was responsible for the rejection of the original bill which was an appropriation bill, and the substitution of the bill which became the law and which, as the Government contends, merely waives immunity and confers jurisdiction.

The plaintiffs are equally insistent that when the wording of the whole act is construed in the light of its legislative history, the conclusion must be reached that the purpose of Congress was to grant full relief to them so that they might receive compensation for their admitted damages whether or no, under the law, such right of recovery otherwise existed. In the first place, plaintiffs point out that the Act is entitled "For the relief of Carlton C. Grant and others" and secondly, the plaintiffs call attention to the words in the Act "notwithstanding the lapse of time or any provision of law to the contrary."

■ As to the first contention, it is true that the title of an act is entitled to consideration as showing the purpose and intent of the framers in its enactment, but certainly the title is not to control over the express wording of the law itself. Besides, it is to be noted that the title is the same as that which was given to the original bill, clearly an appropriation bill, and from the

manner in which the bill was handled by the Committee it would not be unreasonable to assume that the title as it appeared in the original bill was allowed to remain through oversight. However this may be, so far as the Act itself is concerned, the definite and unambiguous words in the body of the Act must control over the title.

■ We come now to the effect to be given the wording which confers jurisdiction "notwithstanding * * * any provision of law to the contrary". Let it be noted that the words quoted are coupled with another provision reading "notwithstanding the lapse of time". Clearly, the latter quoted words do not convey the idea of making an absolute gift to the named persons, rather it seems to give a right to litigate a claim, which but for the concession of the Government might be barred by a statute of limitations. By giving attention solely to the words "any provision of law to the contrary" do these words mean notwithstanding any general principles of law which would operate to preclude recovery of any person or private corporation: or do they mean notwithstanding any statute which would otherwise protect the Government. ' The word "provision" seems to convey the idea of legislative enactment rather than the idea of the general body of the law and general principles of law pronounced by the judiciary. Maybe, no satisfactory explanation is possible, but in any event the wording of the proviso in section 2, that "this Act shall be construed only to waive immunity * * * and not otherwise to affect any substantive rights of the parties" is clear and definite, and from it only one conclusion can be reached: Congress meant to grant the persons named the right to litigate their claims in the District Court and recover compensation if entitled to it under the law without bar by lapse of time or by the immunity which the Government enjoys unless waived.

The above conclusion is based upon a consideration of the Act itself. It remains to be decided whether, when the legislative history is taken into the picture, a contrary conclusion is the proper one. Whatever doubt may exist in regard to what Congress intended to do, it is clear what the Depart-ment of the Army thought it should do. In determining what weight is to be given to the views expressed by the Secretary of the Army two circumstances ought to be borne in mind: (1) It was the act of the Army which constituted the basis of the alleged damages, and naturally the views of the Army were therefore, no doubt, considered of great importance by the Congressional Committee. (2) It appears that the only evidence or views considered by the Committee upon which it is reasonable to suppose that it based its decision to turn down the appropriation bill as offered, and to report the amendment which finally became the law, was the letter of Secretary Royall. In that letter among other things of like import, Secretary Royall wrote: "In view of the highly controversial nature of the issues of fact and law involved, it is the opinion of the Department of the Army that substantial justice would best be assured both to the claimants and to the United States through the medium of a judicial determination by the United States Court of Claims" (the fact that jurisdiction was later conferred on the District Court is of no importance). From the record it appears that upon this alone the appropriation bill proposed was rejected and a bill substantially like the one recommended by Secretary Royall was passed.

But the plaintiffs say that the bill enacted is so different from the one recommended that it must be inferred that the Committee and the Congress were unwilling to go along with the Army's views in the enactment of a law to meet the problem and that in spite of such recommendation Congress enacted an act which should be construed as creating a liability where none otherwise existed. A careful comparison of the recommended bill and the enactment, as it appears to the Court, does not lead to such conclusion. The difference in the titles, even assuming that the change was deliberate, which is doubtful, cannot be permitted to control over the definite wording in the body of the law; and there is really no substantial or significant difference between the wording of Section 1 of the respective bills. In the recommended bill, jurisdiction is conferred "to deter-

mine and render judgment upon the claims of * * * for damages alleged to have been caused by the alleged negligent allowance * * * of the discharge of sewage and laundry waste from Camp Davis * * * across the certain oyster grounds * * * alleged to have been leased * * * from the State of North Carolina;" in the Act jurisdiction is conferred to "determine and render judgment upon * * * claims * * * resulting from dumping sewage and laundry waste * * * into Goose Creek * * *." In both, jurisdiction is conferred to determine claims and not to fix damages. Ordinarily, a claim connotes a controversy, not an admitted liability. And it is most significant that Section 2 of the Act is identical with Section 2 of the recommended bill, and this section expressly provides: "That this Act shall be construed only to waive immunity * * * and not otherwise to affect any substantive rights of the parties." It would have been very simple, if such were the intent, for Congress to have said "to fix the damages" rather than "to hear, determine, and render judgment upon * * * all claims". On the other hand, assuming that Congress only intended to waive the Government's immunity, it would have been difficult to find words to express such intention more clearly.

The parties have cited numerous cases, some seemingly deciding that an act of this type should be construed strictly in favor of the Government, others seemingly deciding to the contrary, but whether construed strictly or liberally the Court is of the opinion that the Act only waives immunity and leaves open for the Court the question of whether the claimants are entitled to recover upon and under the applicable principles of law announced by the Courts.

In brief, the complaints allege that the plaintiffs have leased oyster beds from the State of North Carolina on lands in Alligator Bay and Stump Sound, N. C., lying beneath and bordering on the Intra-coastal Waterway, a great public navigable salt waterway; and that the oysters and oyster beds were damaged by the discharge of laundry waste from the Camp Davis Laundry operated by the United States Army between 1941 and 1945.

In its motion to dismiss the Government relies upon what it terms "several well established principles of law", and to support its position cites numerous cases. Reference will be made to a few of them.

Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 435, 13 S.Ct. 110, 111, 36 L. Ed. 1018, announces this general principle of law: "It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tidewaters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters." This case cited and approved by the Supreme Court of North Carolina in Land Co. v. Hotel Co., 132 N.C. 517, 44 S.E. 39, 61 L.R.A. 937.

Darling v. Newport News, 249 U.S. 540, 542, 39 S.Ct. 371, 63 L.Ed. 759: "The fundamental question as to the rights of holders of land under tidewaters does not present the conflict of two vitally important interests that exists with regard to fresh water streams. There the needs of water supply and of drainage compete. * * * The ocean hitherto has been treated as open to the discharge of sewage from the cities upon its shores * * * The ownership of such land, as distinguished from the shore, would be subject to the natural uses of the water. So much may be accepted from the decisions in Virginia and elsewhere as established law. * * * But we agree with the Court below that when land is let under the water of Hampton Roads, even though let for oyster beds, the lessee must be held to take the risk of the pollution of the water."

Du Pont Rayon Co. v. Richmond Industries, 4 Cir., 85 F.2d 981, 982: "And we think it clear that, while the riparian owner is entitled under the law of Virginia to make a reasonable use of the water as it flows past or laves his land, this right on tidal navigable waters is subject to the jus

publicum, or right of the public, to use the waters for sewerage purposes."

Hampton v. Watson, 119 Va. 95, 99, 89 S. E. 81, 82, L.R.A.1916F, 189: "The sea is the natural outlet for all the impurities flowing from the land, and the public health demands that our large and rapidly growing seacoast cities should not be obstructed in the use of this outlet * * * the owner of any lands bordering upon the sea may lawfully throw refuse matter into it, provided he does not create a nuisance to others. And there can be no doubt that public bodies and officers * * * have an equal right * * * And, whenever tidal streams could be conveniently reached, they have been employed as the medium of discharge to the sea * * * (sewage systems are a public necessity and public right) which is superior to the leasing by the state of a few acres of oyster land * * * When the plaintiff leased this land, he took it with full knowledge of the then existing sewage emptying into Hampton Creek and subject to the public right to increase the same * * *"

Simmons v. Paterson, 60 N.J.Eq. 385, 45 A. 995, 48 L.R.A. 717, 83 Am.St.Rep. 642: "The title of riparian owners along the Passaic River, where the tide ebbs and flows extends only to high-water mark. The state is the absolute owner of the bed of the stream. Such riparian owners, having no title to the bed of the stream, are not entitled to an injunction against the city on account of the pollution of the stream. The title of riparian owners above the ebb and flow of tide extends to the middle of the stream, subject only to a servitude to the public for the purposes of navigation. The pollution of the river by sewage constituted the taking of the property of such owners, which the legislature cannot authorize except upon just compensation."

Northern Transportation Co. v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336: "But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision."

Horstmann Co. v. U. S., 257 U.S. 138, 145, 42 S.Ct. 58, 59, 66 L.Ed. 171: "It is declared that the rule deducible from prior cases * * * is that the appropriation of property by the government implies a contract to pay its value and it is further declared that there need not be a physical taking, an absolute conversion of the property to the use of the public. It is clear from the authorities, it is said, that if by public works the value of the property of an individual is substantially destroyed, its value is taken within the scope of the Fifth Amendment. And it was decided that—'the law will imply a promise to make the required compensation, where property to which the Government asserts no title is taken, pursuant to an act of Congress, as private property to be applied for public uses.' Tempel v. U. S., 248 U.S. 121, 129, 130, 39 S.Ct. 56, 59, 63 L.Ed. 162. This generality has had exception in subsequent cases. It is to be remembered that to bind the government there must be implication of a contract to pay, but the circumstances may rebut that implication. In other words, what is done may be in the exercise of a right and the consequences only incidental, incurring no liability. * * * We think the cases at bar are within the latter decisions, and it would border on the extreme to say that the government intended a taking by that which no human knowledge could even predict."

Scranton v. Wheeler, 179 U.S. 141, 164, 21 S.Ct. 48, 57, 45 L.Ed. 126: "* * * There is not, within the meaning of the Constitution, a taking of private property for public use, but only a consequential injury to a right which must be enjoyed * * * 'in due subjection to the rights of the public,'—an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from which no duty arises to make or secure compensation to the riparian owner."

Sanders v. Atlantic Coast Line Railroad Co., 216 N.C. 312, 315, 4 S.E.2d 902, 904: "Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though

the consequences may impair its use, are uniformly held not to be a 'taking' within the meaning of the constitutional provision."

██ Although the principles announced in the above cases may not be as well settled as the Government asserts, they are, it is believed, supported by the weight of authority in most jurisdictions, including North Carolina. When these principles are applied to the causes of action alleged in the several complaints, a recovery by plaintiffs is precluded, as it would be in an action against a' private individual or corporation. The authorities brought to the attention of the Court by plaintiffs' counsel do not indicate that a contrary conclusion should be reached.

The Court has examined and considered also the following cases: Gregory v. U. S., 102 Ct.Cl. 642, 57 F.Supp. 962; Nolan Bros. Inc., v. U. S., 98 Ct.Cl. 41.

An appropriate decree will be entered.