James T. McGILLIC and Blossom McGillic, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 2405.

United States District Court
D. North Dakota, S. W. D.

July 24, 1957.

566

J. F. X. Conmy (of Conmy & Donahue), Bismarck, N. D., for plaintiffs.

Robert Vogel, U. S. Atty., Fargo, N. D., for defendant, United States.

REGISTER, Chief Judge.

This action was commenced by plaintiffs pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq. and pursuant to Private Law 19, 1st Session, 82d Congress, approved and passed on May 7, 1951, 65 Stat. A9, for the recovery of $38,683.46 against the United States of America, as damages alleged to have been caused to plaintiffs' farmland, fences and buildings by the defendant, and for loss of crops during the years involved. The private law involved will be hereinafter referred to.

Plaintiffs own approximately 170 acres of bottom land lying in the "flood plain" of the Heart River, near a point where the Heart River empties into the Missouri River south and east of Mandan, North Dakota. In 1937 the Soil Conservation Service, an agency or department of the defendant, United States of America, established a tree, grass, shrub and nursery project on a 240 acre tract of land situated adjacent to the south boundary of plaintiffs' land. The Heart River roughly parallels the western boundaries of both plaintiffs' and defendant's properties, and flows in a southerly direction. Both tracts lie within the flood plain or drainage basin of the Heart River and are subject to periodic flooding. Both tracts for many years were not only subject to flooding from the west by the waters of the Heart River, when the volume thereof was in excess of the channel capacity, but were also subject to occasional inundation in the spring of the year by waters backing up from the south at approximately the point where the Heart River empties into the Missouri River; such backing up

of the waters was caused by ice jams which formed at that point.

During the fall of 1937 and spring of 1938, defendant constructed, without objection by the owners of the McGillic property, a comparatively low dike, starting at the Northern Pacific Railway Bridge (which was located near the northwest corner of plaintiffs' land) and continuing southeasterly parallel to the Heart River on said land, and terminating on defendant's land several hundred yards south of its north boundary. This dike was not intended to afford complete flood protection. In 1938 this dike was extended on defendant's property so as to enclose a portion of the then nursery site.

In the spring of 1939 the lands of both parties were flooded, and a portion of said dike washed away. Beginning in the fall of 1939, and continuing into 1941, the Soil Conservation Service caused a substantial dike to be constructed around its nursery site for the purpose of protecting it from the ravages of future floods. The portion of such dike which plaintiffs allege resulted in damage to their property is the dike which was constructed on defendant's property immediately to the south of its northern boundary, in an east-west direction, and which extended roughly from the Heart River on the west to an access road near the northeast corner of defendant's land on the east, and which dike was built at that time. Immediately to the north of this east-west portion of the dike, on defendant's land, there was excavated a trench, or ditch, which was originally a "borrow pit", earth taken therefrom having been used in the construction of the dike, and later was used, maintained, and intended as a drainage ditch for surface waters flowing from plaintiffs' land, causing such waters to flow east and south around defendant's dike.

The decision to construct the dike around the nursery site to protect the government property and preserve the experimental projects carried on therein for public benefit, was recommended by the Regional Director of the Soil Conservation Service, Lincoln, Nebraska.

The plans and specifications therefor were prepared by the Civilian Conservation Corps at state level, and were approved by the Regional Engineer of said Soil Conservation Service. The actual construction work was supervised by the superintendent of the CCC.

Defendant made several attempts to have plaintiffs join with it in the construction of a common, or mutual dike along the entire western boundaries of the two tracts; such attempts were in vain.

In 1948 the North Dakota Highway Department caused to be constructed a substantial dike on the McGillic Tract, such dike commencing at the aforementioned Northern Pacific Railway bridge and in general following the course of the low dike hereinbefore referred to, and terminating at the northwest corner of defendant's property where it joined defendant's dike. United States highway 10 passes along the northeast boundary of a portion of plaintiffs' property. In the spring of 1949, due to unusually high flood waters, this so-called "highway dike" was dynamited pursuant to directions of state authorities, a short distance to the south and east of the railroad bridge, on the McGillic property, the purpose being to relieve the pressure of flood waters which threatened the city of Mandan. Later, in 1949, the State Highway Department rebuilt that part of said dike that had been dynamited and breached.

Plaintiffs allege damages for the years 1945 to 1951, inclusive. Proof of damages is limited to those beginning with the year 1945.

The nursery involved was established and maintained for the production and procurement of nursery stock; the investment of the United States Government therein was substantial—the inventory value of the seedlings and grasses approximated $100,000 at times. A substantial part of the seedlings used throughout North Dakota for windbreaks and shelterbelts came from this nursery project, and seedlings and grass seeds were shipped to other states.

Both tracts of land were flooded in 1937 and in 1939. In each of the years 1943 and 1944 practically all of the Mc-Gillic land was flooded, and floodwaters carried thereon ice cakes, logs and debris. Plaintiffs' land was also flooded in each of the years 1945, 1947, 1948, and 1949; during each of these years the defendant's tract was unaffected by flooding. In 1950 the flood was unusually severe. The "highway dike" on plaintiffs' land was breached and the nursery site was also covered by floodwaters, causing great damage to the nursery property and impairment of its production. As the waters receded, ice cakes, logs, trash and other debris were left on the land of both plaintiffs and defendant. Neither tract was flooded in 1951.

Plaintiffs allege in their amended complaint that

"* * * under the conditions of nature there existing surface waters, including waters cast onto the plaintiffs' land by the flooding of the Heart River, would naturally drain from the plaintiffs' land across the lower land owned by the defendant and eventually back into the Heart River; that prior to 1945 the defendant, acting through said Soil Conservation Service, negligently, improperly and in violation of the plaintiffs' rights imposed artificial conditions upon conditions of nature theretofore existing by building a high and substantial dike around the said nursery and particularly all along the north boundary of * * * (defendant's land) * * * which dike extends in an east-west direction in such manner as to obstruct and inhibit the natural passage of surface waters from the plaintiffs' land; and also dams up and holds water on the plaintiffs' land that theretofore flowed off readily and also operates to dam up and impound flood waters on the plaintiffs' land and to change the natural course or channel of the Heart River during flood time and causes said Heart River to pour onto the plaintiffs' land; that all of the foregoing causes a damaging deposit of sand and debris on the plaintiffs' land thereby deteriorating the soil and causing expense for the removal of sand and debris, damages the buildings and holds water on said land owned by the plaintiffs thus preventing the cropping of the land at the proper time and in some instances preventing the cropping of the land for the entire season."

Plaintiffs' claim, then, is not that defendant's dike, which separated the two tracts, tended to increase the frequency or amount of the flooding, but that such embankment impeded or hindered the normal passage or run-off of flood waters in such a manner as to cause damage to plaintiffs' land.

Both parties moved for summary judgment; plaintiffs' motion related only to the question of liability. These motions were denied by this Court's predecessor, who is now serving as a member of the Court of Appeals for the Eighth Circuit. Subsequent to such denial, defendant renewed its motion for summary judgment, which motion was denied by this Court.

The Federal Tort Claims Act provides when actions can be brought against the United States, as follows: (Title 28 U.S.C.A.)

"§ 1346. United States as defendant * * *

"(b) * * * exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Defendant relies generally on five grounds as a defense or defenses to this action. They are as follows:

(1) That the building of the dike involved in this action was a discretionary method of protecting the property of the United States of America, and was the exercise of a discretionary function on the part of the United States; that the performance of such discretionary function under and by virtue of the provisions of Section 2680, Title 28 U.S.C.A., cannot be the basis for actions brought against the United States;

(2) That the defendant, like any private land owner, had the right to protect its property from the "common enemy", floodwaters;

(3) That the construction of the dike involved in this action was not the proximate cause of plaintiffs' damages;

(4) That such damages as may have accrued because of the construction of said dike were "damnum absque injuria" since the flooding would have been there to cause damage regardless of defendant's acts; and

(5) That where damages to plaintiffs' land were caused by more than one tortfeasor, the plaintiffs cannot recover from a named defendant in the absence of a showing of the amount of damages caused by the particular tortfeasor named in the suit.

Defendant relies strongly upon the first of said grounds, based upon the following statutory provision, which is a part of the Federal Tort Claims Act:

"§ 2680. Exceptions. The provisions of this chapter and section 1346(b) of this title shall not apply to * * *

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

In Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 966, 97 L.Ed. 1427, the Supreme Court stated in part, as follows:

"It will be noted from the form of the section, see 346 U.S. 18, 73 S.Ct. 959, supra, that there are two phrases describing the excepted acts of government employees. The first deals with acts or omissions of government employees, exercising due care in carrying out statutes or regulations whether valid or not. It bars tests by tort action of the legality of statutes and regulations. The second is applicable in this case. *It excepts acts of discretion in the performance of governmental functions* or duty 'whether or not the discretion involved be abused.' * * * " (Emphasis supplied.); and "The 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion."

■ This Court is convinced that the construction and maintenance of the dike involved, under the facts of this case, involved the exercise of a "discretionary function" within the meaning of the exception quoted and that, as a result, there is no liability here on the part of defendant, and that therefore this Court is without jurisdiction to entertain this suit. See Danner v. United States, D.C., 114 F.Supp. 477; Harris v. United States, 10 Cir., 205 F.2d 765; Toledo v. United States, D.C., 95 F.Supp. 838; Dupree v. United States, D.C., 146 F.Supp. 148; Coates v. United States, 8 Cir., 181 F.2d 816; and Olsen v. United States, D.C., 93 F.Supp. 150.

■■ It will be noted that the plaintiffs allege that in the doing of the act complained of ("imposing artificial conditions upon conditions of nature theretofore existing by building a high and substantial dike around the said nursery and particularly all along the north boundary of * * * defendant's land * * * which dike extends in an east-west direction in such manner as to obstruct and inhibit the natural passage of surface waters from the plaintiffs' land", etc.) defendant, acting through the Soil Conservation Service, acted "negligently, improperly and in violation of the plaintiffs' rights", and that "because of the negligent acts of the defendant as aforesaid the plaintiffs have suffered damage". At best, this is an allegation that, in such matter, there was an abuse of discretion on the part of the agent or agents of the defendant * * * and the exception specifically provides that the Act shall not apply " * * * whether or not the discretion involved be abused". However, in view of the fact that the case has been tried on its merits and a substantial amount of evidence and testimony submitted, the Court will state that in its opinion, and the Court so finds, plaintiffs have wholly failed to establish by a preponderance of the evidence any negligence or abuse of discretion on the part of any agent or employee of the defendant in the construction or maintenance of said dike, or as alleged.

Plaintiffs contend that notwithstanding that the building of the dike may have been a *discretionary function*, so as to exempt the defendant from liability therefor under the provisions of Section 2680(a), Title 28 U.S.C.A., statutory immunity from suit has been waived by virtue of the aforementioned Private Law 19, the pertinent provisions of which are as follows:

" * * * That, notwithstanding any statute of limitation or lapse of time *or any provision of law to the contrary*, suits may be instituted within one year * * *." (Emphasis supplied), and

"In any such suit brought pursuant to this Act, proceedings shall be had and the liability, if any, of the United States shall be determined *in accordance with the provisions of law applicable in the case of tort claims against the United States*: Provided, however, That nothing in this Act does or shall constitute an admission of liability on the part of the United States." (Emphasis supplied.)

Plaintiffs contend that the phrase "any provision of law to the contrary" supersedes the "discretionary function" exception to the Tort Claims Act for the purposes of this action. Defendant argues that the phrase has reference only to provisions of law that relate to the lapse of time.

■ Traditionally, under the doctrine of sovereign immunity, it has been said that the Federal Courts have no jurisdiction of claims against the United States. Yankwich, Problems Under the Federal Tort Claims Act, 9 F.R.D. 143, 146–149. The Federal Tort Claims Act gave the courts that jurisdiction, but if the statute of limitations has run or if one of the exceptions embodied in the Act applies, the courts do not have jurisdiction. Toledo v. U. S., supra, Coates v. U. S., supra. It is fundamental, therefore, that the United States, as a sovereign entity, is immune from suit unless it specifically consents thereto. The Federal Tort Claims Act has removed that immunity to the extent that it is not preserved by the limitations and exceptions. As to these plaintiffs, Congress has now removed, by special Act, the immunity preserved by the two year statute of limitations provided for in the Tort Claims Act, 28 U.S.C.A. § 2401.

■ In a number of cases, Courts have been required to construe similar provisions of private laws. Application of that elementary principle of construction, *ejusdem generis*, to the disputed phrase in plaintiffs' private law would seem to limit the meaning to provisions that would bar the suit due to lapse of time. Application of the oft-quoted rules.

that "special acts are strictly construed" and "statutes waiving sovereign immunity are to be strictly construed" would likewise result in the construction that this provision does not constitute a waiver, in favor of plaintiffs, of the "discretionary function" exception. See 63A Federal Digest, United States ☞125(6). The provision that "liability, if any, of the United States shall be determined in accordance with the provisions of law applicable in the case of tort claims against the United States" indicates that plaintiffs' private law is but a provisional consent to be sued under the Federal Tort Claims Act, notwithstanding the two year limitation that it contains. The condition is that plaintiffs' claim must be tested by the other provisions of the Tort Claims Act.

The holdings of cases dealing with similar problems would seem to support this view. See Grant et al. v. United States, D.C., 92 F.Supp. 369, reversed on other grounds, 4 Cir., 192 F.2d 482; Gregory v. United States, 57 F.Supp. 962, 102 Ct.Cl. 642; Klamath and Moadac Tribes v. United States, 296 U.S. 244, 56 S.Ct. 212, 80 L.Ed. 202; Fogarty et al. v. United States, 340 U.S. 8, 14, 71 S.Ct. 5, 95 L.Ed. 10, and Dupree v. United States, supra.

The conclusion of this Court is that plaintiffs' private law does not relieve them from the effect of the "discretionary function" exception to the Federal Tort Claims Act.

Notwithstanding the dispositive effect of the foregoing, the Court considers it advisable to comment briefly upon some of the other issues raised by the pleadings and at the trial of the case, and the evidence submitted concerning the same.

The Court is satisfied, from the evidence, that the construction of the dike complained of did obstruct the flow of surface and flood waters receding from plaintiffs' land. The general area here involved is comparatively flat and level; the flood waters spread out somewhat uniformly in depth; when the floods subside some of the water returns to the river channel, some follows the general land slope, some is trapped in natural depressions, and some disappears through evaporation and seepage. There is no definite drainage pattern as to the entire area, and the surface run-off is generally ill-defined as to course. Some of the surface waters on the McGillic land flowed or drained to the north, and some to the east. However, a substantial portion of plaintiffs' land does slope slightly toward the nursery; the low point on the nursery property line (north) is situated near the center of the north boundary dike. This low area continues generally in a southerly direction through the nursery site, turning towards the east at the lower end of that property. The overall general direction of slope from the McGillic land is to the south, and the trend of the drainage is from the north to the south onto the nursery land. This fact is substantiated by the installation, by defendant, of a "culvert trap" near the south line of said nursery. The purpose of this "trap" was to prevent water from backing up from the south through a drain culvert located near the south boundary dike; the drain permitted surface waters trapped inside the nursery site to escape through the dike. While this depression and gentle slope is not a "drainway" or "water course" under either Federal or state law, it is what is generally known or referred to as a "flood plain" or a "flood plain channel".

It is also established to the satisfaction of the Court that damage to plaintiffs, and delay in drainage, did proximately result from the obstruction of such surface and flood waters. The construction of the dike system removed from the flood plain approximately 240 acres of land. The obstruction caused by the dike not only impeded the flow of the waters, but tended to slow down the flow, thereby resulting in an abnormal amount of sand, silt and debris being deposited along the north edge thereof, on plaintiffs' land. The building and maintenance of the drainage ditch did not fully compensate for the change made

in normal conditions by the creation of the dike.

The testimony establishes that during the years involved, a ridge of sand and silt formed along the south boundary of plaintiffs' land, parallel to the dike and drainage ditch. While there is some testimony to the effect that wind erosion was somewhat responsible therefor, it is also evident that this was partially the result of the existence of said dike and obstruction caused thereby to the flood-waters. Only a few acres of plaintiffs' land were covered by this ridge of sand and silt. However, it has also been established to the satisfaction of the Court that the major, substantial damage complained of and caused to plaintiffs' property resulted from the various floods hereinbefore referred to, and would have resulted thereto whether or not the dikes were in existence. A part of such damage was caused prior to 1945. Testimony concerning the buildings was to the effect that the same were sold for a small amount of their former value, in 1945, because the same were filled with several feet of silt. Evidence disclosed that the fences, particularly those along the west side of plaintiffs' land, were washed away in part by the floods and part thereof buried under several feet of sand and silt. Doubtless much of this damage was caused by floods occurring prior to 1945. Testimony concerning damage to the land itself (expense of leveling, loss of fertility, deterioration of the soil, and the portion necessarily kept out of cultivation, etc.) dealt with the entire tract owned by plaintiffs. Testimony concerning alleged loss of crops was not limited, but dealt with all of plaintiffs' property; also, evidence as to loss of crops was not as to amount of actual net loss, but concerned claimed decrease in gross production. The difficulty of proving proximate damages in a case such as this is readily apparent. Many factors contributed to the overall damage. The construction of the dike contributed to some extent only to a part thereof. Proof of those damages proximately resulting solely therefrom has not been established with reasonable certainty—determination of the amount of such damages would have to be based in part upon information and facts not in evidence, and would be arbitrary, conjectural and speculative.

While the Court feels sympathetic to plaintiffs, insofar as a part of their alleged claims are concerned, and is satisfied they are justified in claiming that the government dike did contribute to some extent to damage to their property, yet the Court is satisfied that, both as to the law and the evidence, judgment must be in favor of the defendant.

Counsel for defendant will prepare and submit to the Court appropriate Order and Judgment in accordance herewith, and will serve a copy thereof upon opposing counsel.

It is so ordered.